FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK H., individually and as
Guardian Ad Litem of Michelle H.
and Natalie H., minors,
                    *Plaintiff-Appellant,*

RIE H., individually and as
Guardian Ad Litem of Michelle H.
and Natalie H., minors,
                    *Plaintiff-Appellant,*

                    v.

PAUL LEMAHIEU, in his official
capacity as superintendent of the
Hawaii Public Schools; ELSIE
TANAKA, in her official capacity as
Principal of Kipapa Elementary
School; JUDITH SARAN-CHOCK, in
her official capacity as Principal
of Ala Wai Elementary School;
PETER CHUN, in his official
capacity as Principal of Hokulani
Elementary School; HAROLDEEN
WAKIDA, in her official capacity as
Principal of Ali'iolani Elementary
School; DEPARTMENT OF
EDUCATION, State of Hawaii; KEITH
HUNTER, SR., special master,
                    *Defendants-Appellees.*

No. 05-16236

D.C. No.
CV-00-00282-MLR

OPINION

Appeal from the United States District Court
for the District of Hawaii
Manuel L. Real, District Judge, Presiding

591

Argued and Submitted
June 6, 2007—Honolulu, Hawaii

Filed January 17, 2008

Before: David R. Thompson, Marsha S. Berzon, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY

### Government Law/Education

The court of appeals reversed a judgment of the district court and remanded. The court held that the availability of relief under the Individuals with Disabilities Education Act (IDEA) does not limit the availability of a damages remedy under the "free appropriate public education" (FAPE) regulations implementing § 504 of the Rehabilitation Act.

Appellants Mark H. and Rie H., both individually and as guardians ad litem for their autistic daughters, sued appellees the Hawaii Department of Education and various school officials in their official capacities in federal district court, seeking damages for alleged violations of the IDEA and of § 504 of the Rehabilitation Act. In the parents' administrative action against Hawaii, an administrative officer determined that their daughters had been denied a FAPE under the IDEA and instructed the state to take a number of steps to remedy the violations. The district court decided that there were no rights, procedures, or remedies available under § 504 for violations of the IDEA's affirmative obligations, and that the regulations implementing § 504 were not enforceable through a private right of action.

The parents appealed.

[1] FAPE under the IDEA and FAPE under the § 504 regulations contain significant differences. Unlike FAPE under the IDEA, "FAPE" under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the "design" of a child's educational program. [2] The § 504 regulations distinctly state that adopting a valid IDEA individualized educational program is sufficient but not necessary to satisfy the § 504 FAPE requirements. Plaintiffs who allege a violation of the FAPE requirement contained in the § 504 regulations, consequently, may not obtain damages simply by proving that the IDEA FAPE requirements were not met. [3] To the extent that the district court ruled, in deciding the first summary judgment motion, that the administrative hearing officer's IDEA decision precluded further litigation as to whether a FAPE was denied under the § 504 regulations, that decision was incorrect.

[4] Congress has clearly expressed its intent that remedies be available under Title V of the Rehabilitation Act for acts that also violate the IDEA. [5] The plain text of 20 U.S.C. § 1415(l) preserves all rights and remedies under the Rehabilitation Act, not just attorney fees. Given the absence of any ambiguity in the statute's text, there was no need to examine its legislative history. [6] Availability of relief under the IDEA does not limit the availability of a damages remedy under § 504 for failure to provide the FAPE independently required by § 504 and its implementing regulations.

[7] Section 504 contains an implied private right of action for damages to enforce its provisions. Whether the parents could bring an action to enforce the § 504 regulations depended on whether those regulations came within the § 504 implied right of action. [8] Whether the § 504 regulations were privately enforceable turned on whether their requirements fell within the scope of the prohibition contained in § 504 itself.

[9] The § 504 FAPE regulations focus on "design" rather than "effect" and establish only a comparative obligation. To the degree the § 504 FAPE regulations could be interpreted as a variety of meaningful access regulation, they would fall within the § 504 implied cause of action. To obtain damages, the parents would ultimately have to demonstrate that the state was deliberately indifferent to the violation of whatever requirements the family validly sought to enforce.

[10] To be enforceable through the § 504 implied private right of action, regulations must be tightly enough linked to § 504 that they "authoritatively construe" that statutory section, rather than impose new obligations. Those regulations that can be enforced through the § 504 private right of action are almost certainly enforceable against the states in a damages action. [11] The case had to be remanded to the district court, where the parents should be given an opportunity to amend their complaint to specify which § 504 regulations they believed were violated and which supported a privately enforceable cause of action.

---

## COUNSEL

Michael K. Livingston, Honolulu, Hawaii, for the plaintiffs.

Dorothy D. Sellers, Deputy Attorney General, Honolulu, Hawaii, for the defendants.

---

## OPINION

BERZON, Circuit Judge:

In 2000, Mark H. and Rie H., both individually and as guardians ad litem for their autistic daughters ("the H. family"), sued the Hawaii Department of Education and various

school officials in their official capacities (collectively, "the Agency") for damages for alleged violations of the Individuals with Disabilities Education Act (IDEA), Pub. L. No. 91-230, 84 Stat. 175 (Apr. 13, 1970), and of § 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794. Among other rulings, the district court held that "there are no rights, procedures, or remedies available under § 504 for violations of the IDEA's affirmative obligations," and that the United States Department of Education's ("U.S. DOE's") § 504 regulations are not enforceable through a private right of action. It is the relationship between the IDEA and the U.S. DOE's regulations implementing § 504 of the Rehabilitation Act that is at the heart of this case.

As it turns out, that relationship is not straightforward. The IDEA requires, among other things, that states accepting funds under the Act provide disabled children with a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1412(a)(1). Section 504 of the Rehabilitation Act requires that disabled individuals not "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" that receives federal funds. 29 U.S.C. § 794. The U.S. DOE regulations implementing § 504 include a requirement that disabled children in schools receiving federal funds be provided a "free appropriate public education." 34 C.F.R. § 104.33. The parties and the district court have assumed throughout this litigation that a violation of the IDEA statutory FAPE requirement necessarily constitutes a violation of the § 504 regulations' FAPE requirement, an understandable assumption given the use of identical language. As we develop below, however, this assumption is wrong. The FAPE requirements in the IDEA and in the § 504 regulations are, in fact, overlapping but different.

This fundamental misunderstanding has complicated our resolution of the issues in this case. Additionally, Congress has clearly stated its intent to preserve all remedies under § 504 for acts that also violate the IDEA. For these two rea-

sons, we hold the availability of relief under the IDEA does not limit the availability of a damages remedy under the § 504 FAPE regulations.

As the H. family has assumed that alleging a violation of the IDEA FAPE requirement is sufficient to allege a violation of § 504, they have not specified precisely whether they believe the U.S. DOE's § 504 FAPE regulations, as opposed to the IDEA FAPE requirement, were violated, and, if so, in what regard. Without some clarity about precisely which § 504 regulations are at stake and why, we cannot determine whether the H. family has sufficiently alleged a privately enforceable cause of action for damages. We thus reverse the order of the district court granting summary judgment to the Agency and remand for further proceedings.

## BACKGROUND

## I.  FACTS

### A.  Historical Background and the *Felix* Consent Decree.

Hawaii has long struggled to provide adequate services to special needs students in compliance with state and federal law. The U.S. DOE performed a site visit to Hawaii in 1991 and determined that the Hawaii Department of Education ("Hawaii DOE") was not complying with federal law "because mental health services were not always provided to meet the needs of special education students."[1] The U.S. DOE report found that although "[t]he [Hawaii] DOE is legally responsible for furnishing these services, . . . [t]he [Hawaii

---

[1] The IDEA does not use the term "mental health services," but requires states to provide "related services" — including, for example, "psychological services, physical and occupational therapy . . . [and] social work services" — "as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26); 20 U.S.C. § 1412.

Department of Health ("Hawaii DOH")] provides some free services to these students, but only when it has the resources." The U.S. DOE warned the Hawaii DOE that it must provide or purchase appropriate mental health services for special education students.

In January of 1993, a report by the Auditor for the State of Hawaii entitled *A Study on the Memorandum of Agreement for Coordinating Mental Health Services to Children*, No. 93-1, acknowledged that efforts to coordinate among state agencies the provision of mental health services for special education students had largely failed. The report concluded that "the [Hawaii DOE] must provide or purchase mental health services for special education students when the [Hawaii DOH] cannot provide these services."

Later in 1993 a class of plaintiffs comprised of disabled children and adolescents eligible for special education and mental health services sued the Hawaii DOE and the Hawaii DOH in federal court, claiming a failure to comply with the IDEA and with § 504 of the Rehabilitation Act. *Felix v. Waihee*, CV. No. 93-00367-DAE. The district court granted summary judgment for the class on the issue of liability, finding that the agencies "ha[d] systematically failed to provide required and necessary educational and mental health services to qualified handicapped children," in violation of both federal laws. Thereafter, in 1994, the parties entered into a consent decree (the "*Felix* Decree"), which was approved by the district court.

In the *Felix* Decree, the two state agencies acknowledged that they had violated the federal IDEA and § 504 of the Rehabilitation Act. The agencies agreed that the Hawaii DOE would provide all educational services the Felix class members require; that the Hawaii DOH would provide all mental health services the class members require to benefit from the educational services; and that the two agencies would create and maintain a system of care adequate to provide a contin-

uum of services, placements, and programs necessary for disabled students. The *Felix* Decree defined the plaintiff class as "all children and adolescents with disabilities residing in Hawaii, from birth to 20 years of age, who are eligible for and in need of education and mental health services but for whom programs, services, and placements are either unavailable, inadequate, or inappropriate because of lack of a continuum of services, programs, and placements." Autistic children fall within the *Felix* class.

## B.  Michelle H.

Michelle H. and Natalie H. are the children of Mark and Rie H. Michelle H. was born on February 15, 1991. In March 1994, a Hawaii DOH psychologist who examined Michelle concluded that she had "mild Autistic Spectrum Disorder (or Pervasive Developmental Disorder)."[2] The DOH psychologist made a number of recommendations to address Michelle's limitations, including enrollment in the Hawaii DOE's Preschool Program, use of numerous autism-specific approaches, and assignment of an extra aide to work one-on-one with Michelle in the classroom. According to the Hawaii DOE, the psychologist's recommendations to deal with Michelle's autism were never implemented "because of difficulties . . . in getting appropriate personnel as well as appropriate funding."

In April 1994, the Hawaii DOE performed its own academic and psychological evaluation of Michelle to determine her early special education needs. The Hawaii DOE found Michelle eligible for early special education services under

---

[2]"Pervasive Developmental Disorder (PDD) is a category designated by the American Psychiatric Association to indicate children with delay or deviance in their social/language/motor and/or cognitive development. . . . Autism is the most severe of the pervasive developmental disorders." Yale Developmental Disabilities Clinic, Information About Pervasive Developmental Disorders, http://www.med.yale.edu/chldstdy/autism/pddinfo.html#difference (last visited December 27, 2007).

the IDEA because of "chronic emotional impairment," not because she suffered from an autism disorder. The Hawaii DOE developed an Individualized Educational Program ("IEP") for Michelle, including placement in a fully self-contained special education classroom on a regular school campus for an extended school year with special education and speech therapy services. Michelle's IEP was updated at regular intervals through 1998, but the recommendations remained substantially unchanged. No representative from DOH attended any of the IEP sessions to discuss mental health services.

In April 1997, the Hawaii DOE changed Michelle's eligibility category from "Emotional Impairment" to "Autism." The Hawaii DOE reassessed her IEP in January 1998, after the diagnosis changed. The recommendations in the new IEP remained nearly identical to those made before the change in diagnosis and included no additional individualized services related to autism.

## C. Natalie H.

Natalie H. was born on August 3, 1992. In 1994, the pre-school that Natalie was attending, concerned that she might have a "pervasive development disorder," referred her to the Hawaii DOH. The Hawaii DOH performed a psychological evaluation in September 1994 and determined that, at the age of two, Natalie was developmentally at the age of a one-year old overall, but that "[she] showed no symptoms of Pervasive Developmental Disorder." In early 1995, Natalie's family doctor observed developmental delays and referred her to Kaiser Permanente for a neurological evaluation. The Kaiser evaluation diagnosed Natalie with autism and recommended that she be provided with appropriate special education.

In the spring of 1995, when Natalie was nearly three, the Hawaii DOE academically evaluated her and deemed her eligible for special education services, classifying her disability

as an "Early Childhood Learning Impairment," not autism. An
IEP prepared for Natalie on July 7, 1995 specified that she
was to be placed in a fully self-contained special education
classroom on a regular school campus for an extended school
year, just as Michelle was.

Natalie's next IEP assessment, in March 1996, noted that
the Kaiser evaluation had concluded in February 1995 that
she was autistic. Natalie's IEP was reevaluated on an annual
basis through 1998, although, as with Michelle, no mental
health representative attended the meetings. In March 1998
the Hawaii DOE changed Natalie's eligibility category from
"Early Childhood Learning Impairment" to "Autism."

## D. The Administrative Hearing.

Natalie and Michelle's parents initiated an administrative
action against the Hawaii DOE in 1999, alleging that the girls
were denied a free appropriate public education ("FAPE")
under the IDEA and § 504,[3] that their IEPs were deficient, and
that the Hawaii DOE had violated their procedural rights. A
hearing was held, and, in a detailed decision, the administra-
tive officer found significant violations of the IDEA. Among
his factual findings were that (1) "No special (autism) ser-
vices were provided from 1994 to 1998"; (2) at the elemen-
tary school the girls attended, "the principal did not include
mental health services as part of the IEP" because "this had
been the system . . . prior to" the *Felix* Decree "and she was
not familiar at that time with the new procedures"; (3) "N
IEP to the present time includes all of the mental health ser-
vices that were authorized or agreed upon by the IEP team";
and (4) Natalie and Michelle's special education teacher w
generally inexperienced and had no experience with autist
children prior to her current job. The administrative offic

---

[3]Although the H. family alleged both IDEA and § 504 violations at t
administrative level, the administrative ruling addressed only the IDE
violations.

determined, based on these findings, that Natalie and Michelle had been denied a FAPE under the IDEA, that their IEPs were inadequate, and that numerous procedural violations had occurred.

The administrative officer instructed the Hawaii DOE to take a number of steps to remedy the violations. There is no contention that the Hawaii DOE has not complied with the administrative order, which was not appealed, or that Natalie and Michelle are currently being denied a FAPE as defined by the IDEA.

## II.  STATUTORY CONTEXT

Before recounting the procedural history of this case, we examine the two related but separate statutes central to this litigation, the IDEA and § 504 of the Rehabilitation Act.

The statute presently known as the IDEA originated in 1970 as part of the Education of the Handicapped Act. Pub. L. No. 91-230, 84 Stat. 175 (Apr. 13, 1970). It was later amended substantially in the Education for all Handicapped Children Act of 1975, Pub. L. No. 94-142, 89 Stat. 773 (Nov. 29, 1975), and was amended again and renamed the "Individuals with Disabilities Education Act" in 1990. Pub. L. No. 101-476, 104 Stat. 1103 (Oct. 30, 1990). For simplicity, we refer to all versions of the statute as IDEA, even though that title did not appear until 1990.

At the time the 1975 amendments were enacted, "the majority of disabled children in America were 'either totally excluded from schools or sitting idly in regular classrooms awaiting the time when they were old enough to [drop out].' " *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005) (quoting H.R. Rep. No. 94-332, p. 2 (1975)). Among Congress's purposes in enacting the IDEA was "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and

related services designed to meet their unique needs and pre
pare them for further education, employment, and indepen
dent living." 20 U.S.C. § 1400(d)(1)(A). The IDEA defines ;
FAPE as:

> special education and related services that — (A)
> have been provided at public expense, under public
> supervision and direction, and without charge; (B)
> meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary
> school, or secondary school education in the State
> involved; and (D) are provided in conformity with
> the individualized education program required under
> section 1414(d) of this title.

20 U.S.C. § 1401(9).

States that receive federal financial assistance under th
IDEA must demonstrate that they have in effect "policies an
procedures" to provide disabled children with a FAPE, b
developing an "individualized education program" ("IEP") f
each child.[4] 20 U.S.C. § 1412(a), (a)(1), (a)(4). The IDE

---

[4] 20 U.S.C. § 1414(d) defines an IEP as:

. . . a written statement for each child with a disability that is
developed, reviewed, and revised in accordance with this section
and that includes—

(I) a statement of the child's present levels of academic
achievement and functional performance, including—

(aa) how the child's disability affects the child's involvement
and progress in the general education curriculum;

(bb) for preschool children, as appropriate, how the disability
affects the child's participation in appropriate activities; and

(cc) for children with disabilities who take alternate assess-
ments aligned to alternate achievement standards, a description
of benchmarks or short-term objectives;

(II) a statement of measurable annual goals, including aca-
demic and functional goals, designed to—

creates a cause of action under which a court may grant individuals "such relief as [it] determines is appropriate" for violations of the IDEA. 20 U.S.C. § 1415(i)(2)(C)(iii). Although injunctive relief is available under the IDEA, "ordinarily monetary damages are not." *Witte v. Clark County School Dist.*, 197 F.3d 1271, 1275 (9th Cir. 1999); *see also Taylor by and through Taylor v. Honig*, 910 F.2d 627, 628 (9th Cir. 1990).

While the IDEA focuses on the provision of appropriate public education to disabled children, the Rehabilitation Act of 1973 more broadly addresses the provision of state services to disabled individuals. Section 504 of the Rehabilitation Act, the Act's core provision, states that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). Section 504 applies to all public schools that receive federal financial assistance. *See* 29 U.S.C. § 794(b)(2)(B) (defining "program or activity" to include the operations of "local educational agenc[ies]").

Agencies may promulgate regulations that implement the requirements concerning treatment of disabled individuals

---

(aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

(bb) meet each of the child's other educational needs that result from the child's disability; . . .

contained in § 504. *See Alexander v. Choate*, 469 U.S. 287, 304 n.24 (1985) (agencies have "substantial leeway to explore areas in which discrimination against the handicapped pose[s] particularly significant problems and to devise regulations to prohibit such discrimination"); S. Rep. 93-1297, at 40-41 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6373, 6390 (Section 504 "does not specifically require the issuance of regulations . . . but it is clearly mandatory in form . . . and such regulations . . . are intended."). The Department of Health, Education and Welfare ["HEW"], the predecessor to the U.S. DOE, promulgated regulations interpreting § 504. Those regulations are currently in force as U.S. DOE regulations. 34 C.F.R. §§ 104.1-104.61.

As pertinent to this case, the U.S. DOE's § 504 regulations require recipients of federal funds to "provide a free appropriate public education to each qualified handicapped person," and define "appropriate education" as:

> regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R.] §§ 104.34, 104.35, and 104.36.

34 C.F.R. § 104.33(a), (b).

The first regulation cross-referenced in § 104.33, § 104.34, requires that recipients place disabled individuals in a "regular educational environment" unless it can be shown that "the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 104.34(a). When a handicapped individual is removed from a regular environment, the facility in which she is placed must be "comparable" to that used by non-disabled students. 34 C.F.R. § 104.34(c). The remaining

cross-referenced regulations, 34 C.F.R. §§ 104.35 and 104.36, require evaluation and testing of all those who need or are believed to need special education, as well as the development of procedural safeguards to ensure that guardians of disabled children receive notice, access to relevant records, and an opportunity for an "impartial hearing."

Section 504 establishes an implied private right of action allowing victims of prohibited discrimination, exclusion, or denial of benefits to seek "the full panoply of remedies, including equitable relief and [compensatory] damages." *Greater L.A. Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1107 (9th Cir. 1987); *see also Barnes v. Gorman*, 536 U.S. 181, 189 (2002). Punitive damages are not available under § 504. *Barnes*, 536 U.S. at 189.

In sum, the IDEA contains a statutory FAPE provision and allows private causes of action only for prospective relief. Section 504 contains a broadly-worded prohibition on discrimination against, exclusion of and denial of benefits for disabled individuals, under which the U.S. DOE has promulgated regulations containing a FAPE requirement worded somewhat differently from the IDEA FAPE requirement. Section 504 can be privately enforced to provide, in addition to prospective relief, compensatory but not punitive damages for past violations.

## III.  FEDERAL COURT PROCEEDINGS

The litigation history of this case is somewhat tortuous. We recount these proceedings in some detail, as they demonstrate the significance of the assumptions about the relationship between § 504 and the IDEA that have persisted throughout this litigation.

In 2000, the girls and their parents filed a federal lawsuit against the Hawaii DOE and various school officials in their official capacities for violations of the IDEA and of § 504 of

the Rehabilitation Act of 1973. The complaint requested compensatory, punitive,[5] and hedonic damages,[6] and stated that it was authorized by § 504 of the Rehabilitation Act, the IDEA, and 42 U.S.C. § 1983. The H. family alleged, among other things, that the "[Agency]'s failure to provide autism specific services to Natalie and Michelle during the crucial years of ages three to seven through appropriately trained personnel and in appropriate classrooms was a violation of § 504, and constituted deliberate indifference to the needs and rights of these children." The complaint continued by alleging that "Michelle and Natalie have been discriminated against by the [d]efendants solely because of their disabilities."

## A.  October 18, 2000 Ruling on Motion to Dismiss.

The Agency moved to dismiss the complaint on several grounds. Among other contentions, the Agency maintained that the IDEA is the exclusive remedy for injuries caused by violation of its provisions. More specifically, the Agency argued that the H. family's § 504 claim is barred because (1) the H. family only litigated the IDEA claims, not the claims under § 504, in the administrative hearing; and (2) § 504 does not provide money damages for acts that also violate the IDEA. The Agency also argued that all of the claims in the complaint were barred by sovereign immunity.

The district court granted the motion to dismiss in part, and denied it in part.[7] With respect to the exclusivity of the IDEA as a remedy, the court determined that the H. family had exhausted its administrative remedies under the IDEA, but did not address the Agency's other arguments as to why the IDEA

---

[5]The H. family has since conceded that punitive damages are not available under § 504, pursuant to *Barnes v. Gorman*, 536 U.S. 181 (2002).

[6]Hedonic damages are "for the loss of the pleasure of being alive." BLACK'S LAW DICTIONARY 417 (8th ed. 2004).

[7]The case was at this point assigned to Judge David Ezra, who had presided over the *Felix* litigation.

cause of action for prospective relief is the only remedy avail-
able to the H. family. The court held that the Eleventh
Amendment did not bar the § 504 claims, but did bar any
claims against the state under § 1983 for money damages.

### B.  July 24, 2001 Summary Judgment Ruling.

The Agency then moved for summary judgment, advancing
several new arguments and reiterating their earlier Eleventh
Amendment arguments. The H. family filed a cross-motion
for partial summary judgment, arguing (1) that the administra-
tive hearing decision on the IDEA was res judicata with
regard to the question whether the girls were denied a FAPE;
and (2) that the appropriate substantive standard in an action
for damages under § 504 is whether a defendant demonstrated
"deliberate indifference" to the disabled individual's accom-
modation needs, not whether a defendant acted with discrimi-
natory animus.

The district court granted the H. family's cross-motion in
its entirety, and granted in part and denied in part the Agen-
cy's motion. In granting the motion, the court held that
"[d]efendants are precluded from arguing that Michelle and
Natalie were not denied FAPE." The court rejected most of
the Agency's arguments on summary judgment but agreed
with the Agency that non-equitable monetary damages are not
available under the IDEA and that the appropriate defendant
for monetary relief is the state, not state officials in their offi-
cial capacities. As a result of these rulings, the only remaining
claim as of 2001 was the § 504 cause of action against the
state itself for monetary relief.

### C.  May 25, 2005 Summary Judgment Ruling.

On March 12, 2004, the case was reassigned to Judge
Manuel Real of the Central District of California, on tempo-
rary assignment to the District of Hawaii. The Agency again
moved for summary judgment, reasserting some arguments

made earlier in its motion to dismiss and motion for summary
judgment and making one new argument: that the H. family's
proffered evidence failed to show the "deliberate indiffer-
ence" the court had ruled was required for a § 504 violation.
In a motion for partial summary judgment filed the same day,
the H. family argued that Judge Ezra's prior rulings governed
as law of the case, and further maintained that they were enti-
tled to summary judgment on the issue of liability because the
Agency failed to provide a FAPE and acted with deliberate
indifference in doing so.

Judge Real granted the Agency's motion for summary
judgment and denied the H. family's motion. He held that
there is no § 504 cause of action for violation of any affirma-
tive right to a FAPE, reasoning that "IDEA procedures remain
the exclusive remedy for correcting problems within the terms
of the act, and for deciding what is best suited to a free appro-
priate public education." Judge Real further held that (1) pur-
suant to *Alexander v. Sandoval*, 532 U.S. 275 (2001), the U.S.
DOE's § 504 regulations can not be enforced through the
right of action implied under § 504; and (2) a state's waiver
of sovereign immunity under § 504 does not extend to claims
for damages for failure to provide an IDEA FAPE. Finally
Judge Real concluded that, even if the H. family had a valid
§ 504 cause of action, the state would prevail on the merits,
because "the [p]laintiffs do not present any evidence that they
were intentionally discriminated against, 'solely by reason of
their disability.' " The case was dismissed. The H. family
appeals from this final judgment.

## ANALYSIS

## I.  EFFECT  OF  IDEA  ON  AVAILABILITY  OF
REMEDIES UNDER § 504 OF THE REHABILITATION
ACT FOR DENIAL OF FAPE.

The district court held that the availability of injunctive
relief under the IDEA precludes suits for damages under

§ 504 for government actions that violate both statutes. This conclusion was erroneous for two reasons.[6]

[6]The H. family argues that Judge Real abused his discretion when he reconsidered Judge Ezra's earlier rulings on whether the IDEA is the exclusive remedy for denial of a FAPE and on whether plantiffs' § 504 claim is barred by sovereign immunity. *See Milgard Tempering v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990) (holding that the district court's application of the law of the case doctrine is reviewed for an abuse of discretion). Our case law leaves some doubt concerning whether the law of the case doctrine constrains a district court's discretion to reconsider its own rulings prior to final judgment. *See City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001) (holding that the law of the case doctrine is "wholly inapposite" when a district court reconsiders an order over which it retains jurisdiction); *but see United States v. Alexander*, 106 F.3d 874, 876-77 (9th Cir. 1997) (holding that the district court was barred from reconsidering, after a mistrial and a change of judges, its own previous ruling on a motion to suppress in the absence of changed law or circumstances); *United States v. Smith*, 389 F.3d 944, 949-50 (9th Cir. 2004) (relying on *Santa Monica Baykeeper* for the holding that "the law of the case doctrine is wholly inapposite" when a district court reconsiders an order over which it retains jurisdiction and distinguishing *Alexander* on the ground that in that case the district court did not reconsider in a "timely" fashion (internal quotation marks omitted)).

We need not resolve here whether the law of the case doctrine ever applies in district court to previous rulings of that district court. Judge Ezra understood the Agency's arguments about the exclusivity of the IDEA remedy as raising only a question of administrative exhaustion, and so never decided whether the IDEA is the exclusive remedy for acts that violate its terms. As a result, there was no ruling by Judge Ezra on the exclusivity of the IDEA, and no "law of the case" on this issue prior to Judge Real's ruling. Further, to the extent that Judge Real decided whether sovereign immunity barred the H. family's actions under § 504, he held only that it barred actions under § 504 to enforce the *IDEA* FAPE provisions. Because, for reasons we develop at length below, the *§ 504* FAPE regulations and the IDEA FAPE requirement are distinct, this ruling did not determine whether actions under § 504 to enforce the § 504 regulations are barred by sovereign immunity. As the H. family may pursue damages only for a violation of the § 504 FAPE requirements, Judge Real's sovereign immunity ruling is simply not relevant. Moreover, the Agency does not rely on or defend Judge Real's sovereign immunity ruling on appeal, stating in its brief that "[i]n the present case, the State is not questioning the fact that it has waived its Eleventh Amendment immunity in return for receiving federal financial assistance under the IDEA and the Rehabilitation Act."

*First*, the district court's conclusion assumed that FAPE in the IDEA and FAPE in the U.S. DOE § 504 regulations are identical. This assumption underlies not only the district court's ruling on the second summary judgment motion but all of the proceedings in this case. In particular, it also underlies the district court's earlier holding that the administrative hearing determination that Michelle and Natalie were denied a FAPE under the IDEA was res judicata with regard to whether they were denied a FAPE under the § 504 regulations. An examination of the definitions of FAPE in the two statutes demonstrates that this assumption is false.

**[1]** FAPE under the IDEA and FAPE as defined in the § 504 regulations are similar but not identical. When it promulgated its § 504 regulations, the U.S. DOE described them as "*generally* conform[ing] to the standards established for the education of handicapped persons in . . . the [IDEA]." Department of Education, Establishment and Title and Chapters, 45 Fed. Reg. 30,802, 30,951 (May 4, 1980) (emphasis added). Although overlapping in some respects, the two requirements contain significant differences.

**[2]** The most important differences are that, unlike FAPE under the IDEA, FAPE under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the "design" of a child's educational program. *See* 34 C.F.R. § 104.33(b)(1) (a FAPE requires education and services "*designed* to meet individual educational needs of handicapped persons *as adequately* as the needs of nonhandicapped persons are met" (emphasis added)); *cf.* 20 U.S.C. §§ 1401(9), 1414(d)(1)(A)(i)(II).

Moreover, the U.S. DOE's § 504 regulations distinctly state that adopting a valid IDEA IEP is sufficient but not necessary to satisfy the § 504 FAPE requirements. 34 C.F.R. § 104.33(b)(2) ("Implementation of an [IEP under the IDEA] is *one means* of meeting" the substantive portion of the § 504

regulations' definition of FAPE (emphasis added)); *id.* at § 104.36 ("Compliance with the procedural safeguards of section 615 of the [IDEA] is *one means* of meeting" the § 504 procedural requirements in § 104.36) (emphasis added). Plaintiffs who allege a violation of the FAPE requirement contained in U.S. DOE's § 504 regulations, consequently, may not obtain damages simply by proving that the IDEA FAPE requirements were not met.

[3] The district court thus erred when it held that the H. family's § 504 claim attempts "to correct what is in essence a mere violation of a [FAPE] under the IDEA," and that the IDEA is therefore the H. family's exclusive remedy. At the same time, this examination of the text of the § 504 regulations and the IDEA demonstrates that the H. family cannot rely on the administrative hearing officer's decision with regard to an IDEA FAPE as dispositive of whether a FAPE was denied under § 504. So, to the extent that the district court held, in deciding the first summary judgment motion, that the administrative hearing officer's IDEA decision precluded further litigation as to whether a FAPE was denied under the § 504 regulations, that decision is also incorrect.[9]

[4] *Second*, and as important, Congress has clearly expressed its intent that remedies be available under Title V of the Rehabilitation Act for acts that also violate the IDEA, overriding the holding of the Supreme Court in *Smith v. Robinson*, 468 U.S. 992 (1984). In *Smith*, the Court considered the relationship between the remedies available under § 504 and those available under the IDEA. Petitioners in *Smith*

---

[9]At oral argument, the H. family stated that they were not relying on that res judicata ruling as dispositive of the specific question whether a FAPE was provided under § 504. We note that our conclusion that the administrative hearing decision is not dispositive of whether Michelle and Natalie were provided a FAPE under § 504 does not affect the district court's holding to the extent that it determined that the administrative hearing decision precludes litigation on the question whether an *IDEA* FAPE was provided.

established that their rights under the IDEA had been violated because no FAPE was provided, and then sought payment of their attorney's fees under Title V of the Rehabilitation Act. *Smith*, 468 U.S. at 1016. The Court in *Smith* held that the "remedies, rights, and procedures" available under the IDEA were the exclusive relief for failure to provide a FAPE, so that remedies under Title V of the Rehabilitation Act, including payment of a prevailing party's attorney's fees, were unavailable. *Id.* at 1019.

Congress responded to the decision in *Smith* by adding to the IDEA what is now 20 U.S.C. § 1415(*l*), which provides.

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

Despite the intervening passage of § 1415(*l*), the district court relied on the reasoning of the Supreme Court in *Smith* and held that, by bringing a damages claim under § 504 for denial of a FAPE, the H. family was impermissibly attempting to "circumvent or enlarge on the remedies available under the [IDEA] by resort to § 504." With regard to § 1415(*l*), the district court concluded, and the Agency here argues, that the legislative history of § 1415(*l*) of the IDEA shows that it was intended only to permit recovery of attorneys' fees under § 504, not damages.

[5] Even if the legislative history supported this conclusion, it could not overrule the statute's plain language. *See Botosan*

*v. Paul McNally Realty*, 216 F.3d 827, 831 (9th Cir. 2000). The plain text of the statute preserves *all* rights and remedies under the Rehabilitation Act, not just attorneys' fees. Given the absence of any ambiguity in the statute's text, there is no need to examine its legislative history.

In any event, the statute's legislative history is not to the contrary. The district court observed that neither the Senate nor House reports discussed the possibility of monetary damages under § 1415(*l*). *See* S. REP. NO. 99-112 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 1798. Nowhere in the legislative history of the statute, however, does Congress state that it was intended to provide only for attorneys' fees, or that it was not intended to allow monetary damages under § 504. *Cf. United States v. Turkette*, 452 U.S. 576, 591 (1981) (observing that, although "the legislative history [of RICO] forcefully supports the view that the major purpose of [the statute] is to address the infiltration of legitimate businesses," that does not require "the negative inference that [the statute] [does] not reach the activities of enterprises organized and existing for criminal purposes" where the plain text of the statute clearly includes all "enterprises").[10]

[6] In sum, availability of relief under the IDEA does not limit the availability of a damages remedy under § 504 for failure to provide the FAPE independently required by § 504 and its implementing regulations.[11]

---

[10]We have recently held that, despite passage of § 1415(*l*), the provisions of the IDEA are not enforceable under § 1983. *Blanchard v. Morton Sch. Dist.*, ___ F.3d ___, 2007 WL 4225789 at *3 (9th Cir. 2007). The conclusion that § 1983 actions cannot be used to enforce the IDEA does not affect our analysis in this case. Section 1415(*l*) explicitly mentions the remedies available under the Rehabilitation Act and indicates that they are preserved, but does not refer to § 1983.

[11]Because the § 504 FAPE requirement differs from the IDEA FAPE requirement, it is not clear how the exhaustion provision of § 1415(*l*) applies to suits for damages for failure to provide a § 504 FAPE. We need not reach this issue, because the H. family did exhaust the IDEA administrative remedies.

## II. IMPLIED RIGHT OF ACTION TO ENFORCE § 504 REGULATIONS.

The district court further held that there is no private right of action available to enforce in any respect the U.S. DOE's § 504 regulations regarding provision of a FAPE. On examination, we observe that the district court's approach to this question did not recognize some considerations likely to be informative in determining whether there is or is not a private cause of action for damages available to enforce the § 504 FAPE regulations. As we explain below, however, we cannot determine without clarification of the H. family's allegations whether the district court's ultimate conclusion — that no cause of action for damages is available on these facts under § 504 — is correct, and so remand for further proceedings.

### A.

[7] It has long been established that § 504 contains an implied private right of action for damages to enforce its provisions. *See Greater L.A. Council on Deafness v. Zolin, Inc.* 812 F.2d 1103, 1107 (9th Cir. 1987). Whether the H. family can bring an action to enforce the § 504 *regulations* will depend on whether those regulations come within the § 504 implied right of action.

[8] In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court addressed the circumstances under which regulations can be enforced using the private right of action created by a Spending Clause-based statute. *See Day v. Apoliona*, 496 F.3d 1027, 1037 n.12 (9th Cir. 2007). *Sandoval* held that disparate impact regulations promulgated under § 602 of Title VI of the Civil Rights Act of 1964 impose affirmative obligations that go beyond the requirements of § 601 and so do not fall within the private right of action created by the statute. *Sandoval*, 532 U.S. at 285-86. According to *Sandoval*, regulations can only be enforced through the private right of action contained in a statute when they "authoritatively construe" the

statute; regulations that go beyond a construction of the statute's prohibitions do not fall within the implied private right of action, even if valid.[12] *Id.* at 284. As applied here, *Sandoval* instructs that whether the § 504 regulations are privately enforceable will turn on whether their requirements fall within the scope of the prohibition contained in § 504 itself.

The district court held that § 504 "merely prohibits intentional discrimination," while the § 504 FAPE regulations purport to create "affirmative obligations." Applying *Sandoval*, the district court concluded that because the § 504 FAPE regulations uniformly impose "affirmative obligations" that are not imposed by the statute itself, they are not enforceable at all through the implied private right of action.

The district court's approach to this question fails to recognize three key features of § 504 and the § 504 FAPE regulations:

*First*, insofar as the district court was drawing a direct analogy to *Sandoval's* prohibition on private causes of action under a disparate impact regulation, that analogy is not entirely persuasive. The § 504 regulations in question — unlike the regulations under § 602 that the Supreme Court characterized in *Sandoval* as "disparate impact" regulations — are not fairly viewed as imposing liability based only on unintentionally created "effects" or outcomes.

The Title VI regulations at issue in *Sandoval* provided that funding recipients may not "utilize criteria or methods of administration which *have the effect* of subjecting individuals to discrimination because of their race, color, or national origin." 28 C.F.R. § 42.104(b)(2) (emphasis added). In contrast, the § 504 FAPE regulations encompass several provisions, the

---

[12]The Court in *Sandoval* made clear that it was not declaring the Title VI disparate impact regulations substantively invalid. *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001).

central requirement being that disabled children must be provided an "education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. § 104.33(b)(1). The plain language of this first, overarching FAPE regulation is not violated by a mere difference in educational outcomes or "effects." Rather, it is violated only if a state fails to "design" educational plans so as to meet the needs of both disabled and nondisabled children comparably. To "design" something to produce a certain, equal outcome involves some measure of intentionality. And an obligation to "design" something in a certain way is not violated simply because the actual impact of the design turns out otherwise than intended.

In contrast, a disparate effect or impact need not be the result of "design" at all, could be entirely accidental, and need not be recognized once it occurs. This much was made clear in *Alexander v. Choate*, 469 U.S. 287 (1985).

In *Choate*, the Supreme Court expressed its view that, while § 504 may prohibit some disparate impacts, it is not intended to prohibit *all* such impacts. *Choate*, 469 U.S. at 299. The Court repeatedly distinguished disparate impact discrimination from other forms of discrimination by noting that disparate impact discrimination arises from actions that discriminate only in "effect" rather than "design." *Id.* at 292, 297. And the Court was concerned that a prohibition on any and all disparate impacts would lead to liability for effects brought about wholly inadvertently, indeed, even for effects that agencies had acted to avoid. *Id.* at 298. By requiring only appropriate "design" of programs, § 104.33 does not fall into that category of "disparate impacts" about which the Court was most concerned in *Choate*.

*Second*, § 104.33 requires a comparison between the treatment of disabled and nondisabled children, rather than simply requiring a certain set level of services for each disabled

child. So, contrary to the district court's apparent concern that the § 504 regulations create free-floating "affirmative obligations," in fact the obligation created is a comparative one. In other words, school districts need only design education programs for disabled persons that are intended to meet their educational needs to the same degree that the needs of nondisabled students are met, not more.

Further, the regulations also prohibit separating handicapped students from nonhandicapped students unless "it is demonstrated . . . that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily," and require that disabled children be provided "comparable facilities" to those used by non-disabled children. 34 C.F.R. § 104.34(a)-(c). Even if some of the other regulations might be characterized as imposing "affirmative obligations" rather than prohibiting discrimination, regulations aimed at preventing baseless segregation of disabled and nondisabled students clearly represent a prohibition on simple discrimination as long understood. *Cf. Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

*Third*, regardless of whether or not the § 504 FAPE regulations can be characterized as to some degree prohibiting "disparate impacts" or imposing "affirmative obligations," the district court gave the prohibition contained in § 504 itself too cramped a reading. The text of § 504 prohibits not only "discrimination" against the disabled, but also "exclu[sion] from . . . participation in" and "deni[al] [of] the benefits of" state programs solely by reason of a disability. 29 U.S.C. § 794(a). This language is nearly identical to the language in Title VI, and, in general, the remedies available under both § 504 and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132,[13] are "linked" to Title VI. *Ferguson v.*

---

[13] "[T]here is no significant difference in the analysis of rights and obligations created by" the Rehabilitation Act and the ADA. *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

*City of Phoenix*, 157 F.3d 668, 673 (9th Cir. 1998). *But see Choate*, 469 U.S. at 293 n.7 ("[T]oo facile an assimilation of Title VI law to § 504 must be resisted."). Nonetheless, the legislative history of the Rehabilitation Act and the nature of discrimination against disabled individuals have led us to construe the § 504 prohibition somewhat more broadly.

This court has recognized that the focus of the prohibition in § 504 is "whether disabled persons were denied 'meaningful access' to state-provided services." *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) (quoting *Choate*, 469 U.S. at 302); *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1020 (9th Cir. 2002) ("[T]he College must provide Bird with 'meaningful access' to its programs."). Thus, although § 504 does not require "substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals," it, like the ADA, does require *reasonable* modifications necessary to correct for instances in which qualified disabled people are prevented from enjoying " 'meaningful access' to a benefit because of their disability." *Southeastern Community College v. Davis*, 442 U.S. 397, 410 (1979); *Choate*, 469 U.S. at 301 (declining to decide whether § 504 encompasses disparate impact discrimination while characterizing "[t]he balance struck in *Davis*" as "requir[ing] that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers" and noting that "to assure meaningful access, reasonable accommodations . . . may have to be made"); *see also Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) ("A failure to provide reasonable accommodation can constitute discrimination under section 504 of the Rehabilitation Act."); *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 979 (9th Cir. 1997). Moreover, contrary to the Agency's contentions at oral argument, evidence that appropriate services were provided to *some* disabled individuals does not demonstrate that others were not denied meaningful access "solely on the basis of their disability." *See Lovell v. Chandler*, 303 F.3d 1039, 1054

(9th Cir. 2002) ("The State's appropriate treatment of some disabled persons does not permit it to discriminate against other disabled people under any definition of 'meaningful access.' ").[14]

The district court and the Agency appear to have forgotten the established § 504 "reasonable accommodation" and "meaningful access" requirements in evaluating whether the § 504 FAPE regulations come within § 504's substantive scope. The reason for this elision may have been a misunderstanding about the distinction between interpreting the scope of the prohibition contained in § 504 and determining the state of mind with which a violation of § 504 must be committed so as to give rise to a damages remedy.

Our cases on the appropriate *mens rea* standard for a § 504 damages remedy recognize — as they must after *Crowder* — that § 504 itself prohibits actions that deny disabled individuals "meaningful access" or "reasonable accommodation" for their disabilities. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1135-36 (9th Cir. 2001); *Ferguson*, 157 F.3d at 679. *Cf. Lovell*, 303 F.3d at 1054 (assuming that "meaningful access" is the appropriate standard). Those cases then go on to analyze the state of mind with regard to a denial of "meaningful access" or "reasonable accommodation" necessary to justify

---

[14]Without deciding whether any cause of action the H. family may allege in the future based on the § 504 FAPE regulations meets the standard of *Sandoval*, we observe that a number of the § 504 FAPE regulations are arguably intended to ensure "meaningful access" to public education. In particular, a disabled individual may be denied "meaningful access" to public education when that education is not designed to meet her needs as adequately as the needs of other students are met. *See* 34 C.F.R. § 104.33. The FAPE regulations also require adherence to certain procedures intended to facilitate provision of a FAPE, including testing and evaluation, 34 C.F.R. § 104.35, and notice to parents of educational plans for their children, 34 C.F.R. § 104.36. Depending on the particular circumstances, testing and evaluation of a disabled child may be necessary to ensure "meaningful access" to an appropriate education, as might notice to a child's parents of the educational plan for that child.

monetary damages. As to this latter question, we have held that plaintiffs must prove a *mens rea* of "intentional discrimination," to prevail on a § 504 claim, but that that standard may be met by showing "deliberate indifference," and not only by showing "discriminatory animus." *See Duvall*, 260 F.3d at 1138; *id.* at 1139 (deliberate indifference is "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood"); *Lovell*, 303 F.3d at 1056. Thus, a public entity can be liable for damages under § 504 if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons.

For purposes of determining whether a particular regulation is ever enforceable through the implied right of action contained in a statute, the pertinent question is simply whether the regulation falls within the scope of the statute's prohibition. The *mens rea* necessary to support a damages remedy is not pertinent at that stage of the analysis. It becomes essential, instead, in determining whether damages can actually be imposed in an individual case. *See Sandoval*, 532 U.S. at 280 (considering which actions are encompassed by the prohibition in § 601).[15] The district court took a misstep when it brought the *mens rea* question into the private cause of action analysis.

[9] In sum, the § 504 FAPE regulations are somewhat different from the Title VI disparate impact regulation in *Sandoval*, because the regulations focus on "design" rather than "effect" and establish only a comparative obligation. Further, because the basic statutory prohibition has been understood somewhat differently in Title VI and § 504, to the degree the

---

[15]We note that, as this brief discussion of our case law on the *mens rea* requirement indicates, to the extent that the district court concluded that the H. family, in order to recover damages, is required to demonstrate a mental state greater than deliberate indifference to the requirements imposed by the FAPE regulations, it erred.

§ 504 FAPE regulations that the H. family invokes can be interpreted as a variety of meaningful access regulation, they will fall within the § 504 implied cause of action. Finally, to obtain damages, the H. family will ultimately have to demonstrate that the Agency was deliberately indifferent to the violation of whatever requirements the family validly seeks to enforce.

## B.

We also note that resolution of the question whether the regulations can be enforced through the right of action in § 504 will likely be dispositive of the Eleventh Amendment sovereign immunity concerns that have frequently popped up in this case. The state argues that, while states do not enjoy sovereign immunity from suits to enforce § 504 itself, *see Lovell v. Chandler*, 303 F.3d at 1051, the U.S. DOE's § 504 regulations cannot be enforced against states because they demand more of the states than they bargained for when they agreed to waive their Eleventh Amendment sovereign immunity.

**[10]** However, as our discussion of *Sandoval* demonstrates, to be enforceable through the § 504 implied private right of action, regulations must be tightly enough linked to § 504 that they "authoritatively construe" that statutory section, rather than impose new obligations. *Sandoval*, 532 U.S. at 284. Regulations that do not impose obligations beyond § 504's prohibition on disability-based disadvantage but instead implement that prohibition are part of the bargain struck between states and the federal government. *See Lovell*, 303 F.3d at 1051; *Douglas v. Cal. Dept. of Youth Auth.*, 271 F.3d 812, 820-21 (9th Cir. 2001); *cf. Vinson v. Thomas*, 288 F.3d at 1151, 1154 (holding that state was not immune from a suit under § 504 in a case in which plaintiff relied in part on Department of Justice regulations promulgated under the ADA). Accordingly, those regulations that can be enforced through the

622     MARK H. v. LEMAHIEU

§ 504 private right of action under *Sandoval* are almost certainly enforceable against the states in a damages action.

## C.

**[11]** We do not here decide whether the H. family has alleged a privately enforceable cause of action for damages against the state. To this point, both parties have proceeded on the assumption that the IDEA and the § 504 FAPE requirements are identical, and have not litigated whether any of the § 504 FAPE regulations, as opposed to the IDEA FAPE requirements, can support a private cause of action. We therefore remand to the district court for further proceedings. On remand, the H. family should be given an opportunity to amend its complaint to specify which § 504 regulations they believe were violated and which support a privately enforceable cause of action. *See Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004) (Federal Rule of Civil Procedure 15(a) embodies a "policy favoring liberal amendment").[16]

For the foregoing reasons, the district court decision is **REVERSED** and **REMANDED**.[17]

---

[16]The H. family also argues that "rare and extraordinary circumstances" require reassignment of the case on remand. *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1118 (9th Cir. 2001) (internal quotation marks omitted). The H. family has pointed to no circumstances sufficient to justify reassignment of the case. Judge Real did not abuse his discretion when he revisited Judge Ezra's earlier substantive orders, nor was his change in the scheduling order for filing pre-trial motions inappropriate. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (district courts have "broad discretion in supervising the pretrial phase of litigation" (quotation omitted)). The H. family's request for reassignment is therefore denied.

[17]As we do not decide whether the H. family has alleged a privately enforceable cause of action, we do not reach the family's argument that the district court erred in holding that there is no material question of fact as to whether plaintiffs were "intentionally discriminated" against so as to

support a damages action under § 504, nor do we reach the family's
motion for summary judgment. We do note that, as with the district court's
ruling on sovereign immunity, the court held only that there was insuffi-
cient evidence of intentional discrimination as to the IDEA's FAPE
requirements, not the § 504 FAPE regulations. The district court's deci-
sion therefore does not determine whether the H. family has demonstrated
a triable issue as to violation of the § 504 regulations.