Barbara Bateman, Ph.D., J.D.
Legal Consultant in Special Education
32223 DeBerry Road
Creswell, OR 97426-9717

January 16, 2001

<u>VIA FACSIMILE TRANSMISSION (808-545-7802)</u>

Stanley E. Levin, Esq.
Davis Levin Livingston Grande
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawaii 96813

  Re: <u>Patricia N., et al. v. LeMahieu, et al.</u>;
    CV 00-000252 DAE/LEK

Dear Mr. Levin,

  Per your request, I address the following matters on Amber N.'s case:

  1. The Individuals with Disabilities in Education Act (IDEA) and whether it covers Amber N., a student who has autism;

  2. How the IDEA treats the question of ensuring that a Free Appropriate Public Education (FAPE) is actually delivered to a student;

  3. What is meant by and included in the term "free" in FAPE;

  4. Autism and Discrete Trial Training (teaching) (DTT);

  5. The cost of DTT;

  6. How school officials normally integrate the home and in-school programs;

  7. What is Section 504 and how does it operate in relation to Section 504;

  8. Contrast remedies available under the IDEA with those available under Section 504; and

**EXHIBIT G**

Mr. Levin
Re: <u>Patricia N., et al. v. LeMahieu, et al.</u>
January 16, 2001
Page Two

      9.    Whether the IDEA requires that parents put the State of Hawaii, Department of Education (DOE) on notice of a claim under the IDEA?

    My responses to these questions are as follows:

      1.    The IDEA is a federal funding law originally passed in 1975 as the Education For Handicapped Act and amended in 1984, 1990 and 1997. It's purposes are (1) to ensure that every child with a disability has available to him or her a free appropriate public education designed to meet his or her unique needs; (2) to ensure that the rights of children with disabilities and those of their parents are protected; (3) to assist states in providing FAPE to all children with disabilities; (4) to assist states in implementing early intervention services for infants and toddlers with disabilities and their families; (5) to ensure that educators and parents have the tools to improve educational results; and (6) to access and ensure the effectiveness of efforts to educate children with disabilities.

    At this time, the State Education Agencies of all 50 states have opted to receive funding under the IDEA and to ensure statewide compliance with all of its requirements.

    To be eligible for the entitlements of the IDEA, a child must have one of the 13 disabilities enumerated in 34 C.F.R. 300.7 and must, by reason of that disability, need special education and related services. "Autism" is now one of the 13 named categories of disability and has been so since 1990, when the IDEA was amended. Prior to 1990, autism was considered to be an "emotional disturbance" another of the eligibility categories, then and now. Every child in the U.S. and territories who has autism and needs special education, including Amber, is IDEA eligible.

      2.    Under the IDEA, the state education agency – in Hawaii, the DOE – is responsible for ensuring that the requirements of the IDEA are met. The DOE is the "Harry Truman" or "buck stops here" agency. If another public agency, which is obligated under state or federal law or by an interagency agreement to provide or pay for services to which a child is entitled under the IDEA fails to do so, the DOE must step in and provide or pay for the service in a timely manner and then claim reimbursement from the other agency (20 U.S.C. §1412(a)(12); 34 C.F.R. 300.142; 300.600; 300.360). Interagency agreements are contemplated and encouraged by the IDEA, but the DOE remains ultimately responsible for ensuring the availability of FAPE to every disabled child in the state. It is the State Education Agency (SEA) which submits to the U.S. Office of Education the State Plan in

Mr. Levin
Re: <u>Patricia N., et al. v. LeMahieu, et al.</u>
January 16, 2001
Page Three

which the SEA spells out how it will ensure that the IDEA, including FAPE, is implemented in that state. Approval of that state plan entitles the state to receive the federal funding available under the IDEA. Thus, it is the SEA that has contracted with the U.S. Office of Education and is ultimately responsible for ensuring FAPE is available to all IDEA-eligible children in the state.

   3. Under both the IDEA and Section 504, the word "free" in Free Appropriate Public Education means <u>at no cost to the parents</u>. In <u>Oceanside City (Ca.) Unified Sch. Dist.</u> (5/24/96) 25 IDELR 170, the Office of Civil Rights said: "Implementation of the responsibility to provide FAPE requires that all necessary instructional materials be provided...at no cost to the parent." In this case of a student on home instruction, that included all "necessary" materials and supplies.

   In <u>Ind. Sch. Dist. No. 281 (Robbinsdale)</u>, 28 IDELR 370 (Minn. SEA, 1998), involving twins who had autism and received an in-home Discrete Trial Training program, the parents were reimbursed for (1) therapy costs of 40 hours per week, (2) supervision of 10 hours per week, and (3) items which were used exclusively for the students' educational program: such as pencil adapters, job charts, books, tool sets, markers, flashcards, alphabet cards, picture cards, office supplies, film and film processing, snack-type food reinforcers (sweet rolls, crackers and Oreo cookies), Kleenex, disposable plates and more. The Hearing Officer cited with approval <u>In re G.</u>, 27 IDELR 451 (N.C. 1997), where home therapy expenses that were "unambiguously related" to the student's education were reimbursed.

   4. The Autism Society of America formally recommends "behavior therapy" and no other therapy. Behavioral therapy, or applied behavior analysis, uses DTT to teach compliance, imitation, independent play and spontaneous vocalization primarily on a 1:1 basis. Later, behavior objectives include complex receptive language and vocal imitation skills and finally natural social language, and involves a gradual fading of 1:1 instruction and the introduction of more group interaction.

   In DTT, a child makes a response (initially prompted) to a stimulus, the response is immediately reinforced or extinguished and a new trial begins. Small tasks are thus taught, mastered and built upon. Careful records are kept of each trial.

   5. Fort hours a week of in-home ABA training is commonly recommended initially and then the amount of time is adjusted up or down, as needed for the individual child. At least two cases have awarded 70 hours a week of in-home ABA (an unpublished Oregon case; High Bridge Bd. Of Ed., 24 IDELR 589 (NJ SEA, 1995).

Mr. Levin
Re: Patricia N., et al. v. LeMahieu, et al.
January 16, 2001
Page Four

Typically, the most intensive 1:1 program occurs in the first and second years of ABA and is gradually reduced in intensity as small group interaction becomes possible. While there is a significant range, a 40 hour week in-home ABA program costs about $40,000 to $50,000 annually, plus start up costs of $3,000 to $5,000.

      6.    After the child has mastered objectives related to compliance, imitation, independent play, spontaneous vocalizations, control of stereotypic movements, vocal imitation and more, a gradual and careful integration into a school setting is begun, with ample consultation among parents, service providers and school personnel, and with intensive supervision by a person with expertise in autism and ABA.

      7.    Section 504 is a federal anti-discrimination law passed two years before the IDEA and was intended to prevent discrimination based on disability by agencies that receive or benefit from federal funds. Like the IDEA, it requires that FAPE be made available to all children who have a disability. While the definitions of disability are different in the two laws, every child who is covered by the IDEA is also covered by Section 504, but the converse is not true.

      8.    In spite of the clear language of the statute and the U.S. Supreme Court ruling in Franklin v. Gwinnett Co. Public Schools, 503 U.S. 60, 112 S.Ct. 1028 (1992), the remedies available under the IDEA have been viewed conservatively. For example, a recent court said:

> "The plaintiff claims that the defendants failed to provide him with a free appropriate public education. As a result, plaintiff contends that he is entitled to compensatory and punitive damages under the IDEA.
>
> The IDEA authorizes a district court "to grant such relief as the court determines is appropriate". §1415(i)(2)(B)(iii). "This relief may include tuition reimbursement." Searles v. Board of Educ. of the Ellenville Cent. Sch. Dist., Nos. 96-CV-0637, 97-CV-0572 (N.D.N.Y. Jan. 13, 1999) (citing School Comm. of Burlington v. Department of Education of Mass., 471 U.S. 359, 370-71, 105 S. Ct. 1996 (1985); Garro v. Connecticut, 23 F.3d 734, 736 (2d Cir. 1994); Mrs. C., 916 F.2d at 75; Burr v. Ambach, 863 F.2d 1071, 1077 (2d Cir. 1988), vacated on other grounds sub nom. Sobol v. Burr, 492 U.S. 902, 109 S.Ct. 3209 (1989)), but does not include compensatory or punitive

Mr. Levin
Re: <u>Patricia N., et al. v. LeMahieu, et al.</u>
January 16, 2001
Page Five

>   damages. See <u>Sellers v. School Board of Mannassas</u>, 141 F.3d 524, 526-28 (4th Cir. 1998)(holding that "tort-like damages are simply inconsistent with IDEA's statutory scheme" which strongly favors provision or restoration of educational rights); see also <u>Heidemann v. Rother</u>, 84 F.3d 1021, 1033 (8th Cir. 1996)(stating that general or punitive damages are unavailable under the IDEA); <u>Wenger</u>, 979 F.Supp. at 152 (holding that "the IDEA does not provided for com[ensatory money damages"); <u>Charlie F. v. Board of Educ. of Skokie Sch. Dist.</u>, 98 F.3d 989, 991 (7th Cir. 1996)(stating that the relief intended under the IDEA includes only prospective or restitutionary types of relief, not general damages). Consequently, plaintiff may not recover the compensatory and punitive damages he seeks under the IDEA. <u>Butler v. S.Glen Falls Center Sch. Dist.</u>, 33 IDELR 3 (N.D.N.Y. 2000)."

The same court addressed remedies under Section 504:

>   "A plaintiff aggrieved by a violation of §504 of the Rehabilitation Act may be entitled to compensatory damages. See <u>Bartlett v. New York State Bd. Of Law Examiners</u>, 156 F.3d 321, 331 (2d Cir. 1998); judgment vacated on other grounds, 119 S. Ct. 2388 (1999). However, the plaintiff must demonstrate intentional discrimination. Id. "Something more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities." <u>Wenger</u>, 979 F.Supp. at 152. Rather, a plaintiff must demonstrate that the "school district acted with bad faith or gross misjudgment." Id. (citing <u>Brantley v. Independent Sch. Dist. No. 625</u>, 936 F.Supp. 649, 657 (D. Minn. 1996)). The plaintiff is not required to show "personal animosity or ill will. Rather, intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom." <u>Bartlett</u>, 156 F.3d at 331 (citations omitted)(internal quotations omitted).

Mr. Levin
Re: <u>Patricia N., et al. v. LeMahieu, et al.</u>
January 16, 2001
Page Six

In this case, the plaintiff has presented sufficient evidence to survive summary judgment with respect to his claim for compensatory damages under the Rehabilitation Act. The plaintiff has presented evidence that the defendant school officials failed to develop IEP's for the plaintiff, developed several IEP's that were determined to be inappropriate for his educational needs, and failed to provide him with certain special education services. Such conduct, if proven, may constitute deliberate indifference to the strong likelihood that plaintiff's rights were being violated.

The Second Circuit has not yet decided whether punitive damages are available under §504. However, "several Courts of Appeal have held that the Supreme Court's decision in <u>Franklin v. Gwinnett County Public Schs.</u>, [503 U.S. 60, 112 S.Ct. 1028](1992), implies that the [Rehabilitation] Act should be read as authorizing all traditional legal and equitable remedies." <u>Zaffino v. Surles</u>, No. 91 CIV. 1637 (MGC), (S.D.N.Y. March 31, 1995). Thus, several courts have determined that, pursuant to <u>Franklin</u>, punitive damages are included in the full panoply of remedies available under the Rehabilitation Act, absent clear direction from Congress. See id.: see also <u>DeLeo v. City of Stanford</u>, 919 F.Supp. 70, 73 (D. Conn. 1995), <u>Kedra v. Nazareth Hosp.</u>, 868 F.Supp. 733 (E.D. Pa. 1994); <u>Howe v. Hull</u>, 873 F.Supp. 72 (N.D. Ohio 1994). In light of these authorities, plaintiff may be entitled to recover punitive damages from the individual defendants pursuant to §504. <u>Butler v. S.Glen Falls Center Sch. Dist.</u>, 33 IDELR 3 (N.D.N.Y. 2000)."

Violations of IDEA because of "deliberate indifference" may be compensable under §504. The 3rd Circuit has held that under §504, discrimination need not be intentional in order to be compensable. See <u>W.B. v. Matula</u>, 67 F.3d 484 (3d Cir. 1995). Generally, compensatory damages are available under §504 on a showing of bad faith or gross misjudgment.

9. IDEA does not require that parents provide notice to the district of a claim except when they (the parents) remove a child from public school, place the child in a private school, and seek reimbursement. Under those circumstances, reimbursement may be limited or denied unless the parents either gave written notice 10 days prior to removal, or at the most recent IEP meeting prior to removal, explained their concerns and stated their

Mr. Levin
Re: Patricia N., et al. v. LeMahieu, et al.
January 16, 2001
Page Seven

intent to remove the child. Even under this circumstance, the requirement does not apply unless the parents were given prior notice of it.

Apart from statutory requirements, the reality is that whenever a parent proposes a change (or refused a proposed change), in the child's identification, evaluation, program or placement and the district refuses the proposal (or proposes its own) then the district must give the parents written notice of the proposal or refusal, including the basis for it, and more. Thus, the parents have given "notice" and the district is required by law to respond with a formal written notice (34 C.F.R. 300.503, 504).

In addition to the above, attached hereto is a copy of the transcript of my testimony at the administrative hearing and I hereby incorporate that testimony into this report.

Furthermore, I'd like to state that it is my professional opinion that if Amber had not received the DTT her parents had arranged for her and provided, in large part, themselves, she would definitely not be where she is today. Amber would be substantially further behind academically and socially if not for the efforts of her parents.

Please feel free to contact me if you have any questions as to the foregoing.

Sincerely,

Barbara Bateman

Barbara Bateman, Ph.D., J.D.

Attach: Administrative Hearing Testimony