1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

MARK H. and RIE H.,                )
individually, and as Guardians     )
Ad Litem of MICHELLE H. and        )
NATALIE H., minors,                )
                                   )
              Plaintiffs,          )
                                   )
       vs.                         ) No. CV 00-00282 MLR-LEK
                                   )
PAUL LEMAHIEU, in his official     )
capacity as Superintendant of      )
the Hawaii Public Schools;         )
ELISE TANAKA, in her official      )
capacity as Principal of Kipapa    )
Elementary School; JUDITH          )
SARAN-CHOCK, in her official       )
capacity as Principal of Ala       )
Wai Elementary School; PETER       )
CHUN, in his official capacity     )
as Principal of Hokulani           )
Elementary School; HAROLDEEN       )
WAKIDA, in her official            )
capacity as Principal of           )
Aliiolani Elementary School;       )
and DEPARTMENT OF EDUCATION,       )
STATE OF HAWAII,                   )
                                   )
              Defendants.          )
_____)

DEPOSITION OF BARBARA BATEMAN, Ph.D., J.D.
MILLBRAE, CALIFORNIA
JUNE 5, 2008

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com


REPORTED BY:   JANE H. STULLER, CSR No. 7223, RPR
FILE NO.:   A20466C

**142**

1  what you did for the comparative analysis —
2     A. Well --
3     Q. That was meant as a segue into --
4     A. Oh, that's far -- that's far -- that's far
5  simpler. We could have started right there.
6     Q. Okay.
7     A. When a child is unable to communicate or
8  socialize, they are denied access, in every meaningful
9  way, to the education process. And the failure to
10 provide them with the beginning tools for both
11 communication and socialization absolutely locked that
12 statutory door. And the regulatory comparative, in my
13 mind, for them, is not -- I don't know, the statutory
14 violation is just so clear that I didn't dwell that much
15 for those two on the regulatory issues.
16    Q. So it's your opinion that Michelle and Natalie
17 were denied meaningful access to education because they
18 were not provided with speech and communication
19 services; is that correct?
20    A. Yes. Services broadly understood.
21    Q. Okay.
22    A. Those are the two major components that they
23 would have gotten in an ABA program that would have
24 enabled them then to access so much more, yeah.
25    Q. Okay. So that's -- well, they're denied access

**143**

1  because of not being provided the -- let's just call it
2  communication services, and that blocked them from, I
3  guess, accessing other educational benefits; is that
4  correct?
5     A. That is correct. But it would be even more
6  correct if we said, it was the denial of the
7  autism-specific programming.
8     Q. Okay. Okay. And you're saying, and -- and
9  compared to what is provided to a nondisabled child,
10 they are given those services which allow them to
11 participate in -- or to have access to education
12 benefits?
13    A. We're shifting gears now, from statutory, which
14 is the accessibility, meaningful access to education.
15 I'm saying they were denied that statutory, right. Now,
16 if we shift to the regulatory comparative --
17    Q. Yes.
18    A. -- analysis.
19    Q. Well, tell me about the regulatory analysis.
20 That might be clearer.
21    A. That's the -- the program has to be designed to
22 meet their educational needs as adequately as the
23 educational needs of the nondisabled are met as
24 104-33-B.
25    Q. Right.

**144**

1     A. In -- in that context, then I looked at
2  children's needs and socialization is -- is a big one.
3  We teach kids in kindergarten, preschool, and on, to
4  share, to cooperate, to follow directions, to become
5  leaders across physical settings. That's what we do for
6  nondisabled kids.
7        So then I asked myself: Did we do that with
8  Natalie and Michelle? And the answer was, no.
9  Communication skills, we teach speaking skills. Kids --
10 I don't how old your kids are, but -- and kids -- kids
11 have show and tell in kindergarten and -- and first
12 grade. We teach them speaking and listening and writing
13 and reading.
14    Q. And just for the record, I want the record to
15 show that Dr. Bateman is referring to Exhibit 3.
16       Okay. Sorry about that.
17    A. Oh, and I asked myself: Were Natalie and
18 Michelle adequately and appropriately taught speaking,
19 listening? No, they were not. And those are just, you
20 know, so important.
21       As far as I know, they were not taught content
22 subjects, such as science or social studies because they
23 don't have the prerequisite communication and -- like
24 basic reading skills even. So I -- I applied this list
25 of children's needs: Do Natalie and Michelle have these

**145**

1  needs? Yes.
2        Were they addressed by these things that we
3  provide to nondisabled, meaning one through six or one
4  through four at the time? And the answer was, no.
5  Well, this is the framework that I used.
6     Q. In order to determine -- in order to determine
7  -- well, let me back up.
8        Under Child's Needs on Exhibit -- Children's
9  Needs under Exhibit 3, Children's needs refers to
10 Michelle and Natalie, correct?
11    A. No.
12    Q. Oh.
13    A. The educational needs of school age in Hawaii.
14    Q. Okay. And --
15       MR. LEVIN: Nondisabled.
16       MR. USHIRODA: Nondisabled.
17       THE WITNESS: Yeah.
18       MR. LEVIN: Okay.
19       THE WITNESS: Yeah. And my belief is, all
20 children need these things. It's a matter of how far
21 they can go.
22 BY MR. USHIRODA:
23    Q. Right. Okay. And in order to determine that
24 Natalie and Michelle did not receive these needs that
25 you have listed under Children's Needs, how did you

**174**

1 the past who have autism -- strike that. I'll come back
2 to that later.
3     Dr. Bateman, are you going to offer an opinion
4 -- okay. Now, Doctor, I know -- strike that.
5     Doctor, I know that one of your findings is
6 that the Department of Education failed to provide an
7 autism-specific program to Michelle and Natalie during
8 1994, correct?
9   A. Yes.
10  Q. Okay. Are you going to render an opinion on
11 whether the DOE's alleged failure to do that constituted
12 deliberate indifference?
13  A. If asked, I will.
14  Q. Have you been asked to render such an opinion?
15  A. Not at this point in time.
16  Q. Do you have an opinion sitting here today?
17  A. You bet I do.
18  Q. And what is that opinion?
19  A. My opinion is that one could not, in the years
20 1994 through 1999, be unaware of the importance of
21 autism-specific programs for children who have autism if
22 we're -- when we're talking about professionals in the
23 field who are paid to know those things. At that point
24 in -- in history, it was well established. Lovaas work
25 at that time was at 35 years old.

**175**

1   Q. So what would your answer be -- strike that.
2     Is that contained in any of your reports that
3 you have just stated?
4   A. Are we limiting this to the two Horsley girls?
5   Q. Yes.
6   A. I don't recall whether I've said that in those
7 words or not.
8   Q. Or have you said words to that effect in any of
9 the reports that you've issued for the Horsley girls?
10  A. I would have to reread them to see.
11  Q. Why don't you take a look?
12  A. Both girls were known to have autism spectrum
13 disorders at very early ages. That is not in dispute.
14 It not disputed that there has been substantial
15 testimony that a delay in appropriate services causes
16 irreparable harm.
17    From that, I think a reasonable person could
18 infer that it is my belief that DOE decision makers
19 should know that by not providing those services, they
20 were causing harm.
21  Q. To Michelle --
22  A. They have to have known that.
23  Q. To Michelle and Natalie?
24  A. To Michelle and Natalie.
25  Q. And that, in your mind, is deliberate

**176**

1 indifference?
2   A. Or -- or more.
3   Q. What is deliberate indifference?
4   A. It's a term of art that I'm not prepared to
5 give a -- a clear definition. I think it's somewhere in
6 between negligent or -- or mere neglect and intentional
7 harm. It's -- to me, deliberate indifference is knowing
8 -- knowing that you're causing harm and not doing
9 anything about that. So it's intermediate between
10 negligence and a deliberate act --
11  Q. Okay.
12  A. -- or an intentional act. The intent was not
13 to cause the harm. The intent was to deny the services,
14 in my opinion.
15  Q. Now, does it have -- does the intent to deny
16 the service have to be solely based on the person's
17 disability?
18    MR. LEVIN: Could you read that again?
19    MR. USHIRODA: Just the question.
20    (Record read.)
21    THE WITNESS: No.
22 BY MR. USHIRODA:
23  Q. So you can have a violation of Section 504
24 without there being discrimination based solely on the
25 person's disability?

**177**

1   A. Would you repeat that, please?
2     MR. USHIRODA: Can you repeat the question?
3     (Record read.)
4     THE WITNESS: I'm having trouble with that
5 because, as we -- we know, we're not -- were it not for
6 the disability, there wouldn't be the discrimination.
7 So in that sense, the discrimination is based solely on
8 the disability. But we also know that people give many
9 other reasons, the child, for example. The child who is
10 diagnosed as having severe behavior disorders is not
11 allowed to go on the field trip.
12    The public school says, Oh, it's not because he
13 has a disability. It's because of the safety of the
14 other children. The two issues get intertwined. And
15 that's where the reasonable accommodation comes in. And
16 if it is possible to offer a reasonable accommodation
17 that would allow the discrimination not to happen, but
18 you don't do that, then it is discrimination even though
19 you can claim these other reasons.
20 BY MR. USHIRODA:
21  Q. Did you read anything in the records as an
22 explanation as to what efforts the DOE made to provide
23 Michelle and Natalie with an autism-specific program
24 between the years '94 and '99?
25    MR. LEVIN: Objection; asked and answered.

**178**

1  THE WITNESS: Did I read anything in the
2  records as to what they did do?
3  No. I don't -- I can't recall anything in the
4  records that spoke to what they tried to do, if
5  anything, to provide an autism-specific program.
6  BY MR. USHIRODA:
7  Q. Okay. Now, when I asked you if you were going
8  to express an opinion on whether the denial -- well, the
9  failure to provide an autism-specific program
10 constituted deliberate indifference, you told me, yes,
11 because how could they not know that these programs were
12 available at the time, correct?
13 A. Correct.
14    MR. LEVIN: Objection; misstates testimony.
15    THE WITNESS: I'm sorry.
16 BY MR. USHIRODA:
17 Q. Okay. What is that based on?
18    MR. LEVIN: Objection; asked and answered.
19 BY MR. USHIRODA:
20 Q. What facts are those based on?
21 A. The length of time that effective programs had
22 been available, the amount of training that had been
23 conducted in Hawaii at the time, the prevalence in the
24 literature of references to these effective programs,
25 and other similar -- you couldn't be alive in special ed

**179**

1  in 1994 and not know about the autism-specific programs
2  that had been developed. It's not possible.
3  Q. Okay. At the time in 1994, who was responsible
4  for providing the autism-specific services?
5  A. You mean, in the chain of command at DOE?
6  Q. Yes.
7  A. I don't recall names of people 14 years ago. I
8  don't know.
9  Q. In 1994, what role did the Department of Health
10 play in providing autism-specific services?
11 A. The Felix Consent Decree, as I recall -- I
12 believe that was in October of 1994. Okay. So at that
13 time, DOE had been under statutory law. They had been
14 responsible for providing those programs for some time.
15 Under the Felix Descent -- Consent Decree, it became
16 evident to one and all that DOE was responsible.
17    Now, DOH, of course, as any other agency is
18 allowed under contractual or other agreements with DOE,
19 to be a service provider. But DOE was ultimately
20 responsible at that time. And if DOH failed in some of
21 its duties, it was up to DOE to make sure that,
22 nevertheless, the kids were provided with the
23 appropriate services.
24 Q. Now, are you aware of any facts that would --
25 that indicate that the DOE made a good-faith effort to

**180**

1  provide Amber -- I mean, Michelle and Natalie with
2  autism-specific services?
3     MR. LEVIN: Objection; asked and answered.
4     THE WITNESS: No. I'm not aware of any
5  good-faith efforts they made.
6  BY MR. USHIRODA:
7  Q. Do you know if there were a finding of good
8  faith on the part of the defendants in this case, would
9  that precluded recovery under Section 504 of the
10 Rehabilitation Act?
11    MR. LEVIN: Objection; irrelevant question.
12    Instruct the witness not to answer.
13    MR. USHIRODA: You can instruct, but she's not
14 your witness.
15    THE WITNESS: You're asking if good faith is a
16 defense to deliberate indifference?
17 BY MR. USHIRODA:
18 Q. Yes. If you -- let's assume that the
19 defendants believed, in good faith, they were providing
20 FAPE to Michelle and Natalie. Would that bar recovery
21 under Section 504?
22    MR. LEVIN: Objection; facts -- assumes facts
23 in evidence, not an appropriate hypothetical.
24 BY MR. USHIRODA:
25 Q. I ask because you're being proffered as an

**181**

1  expert under the law -- under IDE and 504 law.
2  A. I don't know the answer to that. I don't know
3  that it's been settled. To me, what would make sense
4  would be how reasonable was it for someone, in a
5  position of that kind of authority at that point in
6  time, to claim a good-faith defense; that is, I just
7  didn't know.
8     And when it's not reasonable, I don't believe
9  that that would possibly be a defense. And it is my
10 view that it was not reasonable in 1994 for a DOE
11 employee, at any level related to autism, to claim they
12 thought Kipapa -- that they thought Kipapa was an
13 autism-specific program.
14 Q. Okay. So the short answer is, no, you don't
15 know?
16 A. That's part of the answer.
17 Q. Okay. What's -- and the other part is what you
18 have just explained?
19 A. Correct.
20 Q. Okay. Did you read Judge Ezra's decision
21 issued in Patricia N v. Lemahieu?
22 A. That's the Nahale case.
23 Q. Yes.
24 A. Yes. I believe I've read Ezra's decision. I'm
25 -- I'm not positive. I've read all the decisions that

**182**

1  Stan has sent me.
2      MR. USHIRODA: You got an objection?
3      MR. ELLIS: No objection. Just go ahead.
4      THE WITNESS: How could good faith be a defense
5  to deliberate indifference? That doesn't make sense.
6      (Whereupon, Defendants' Exhibit No. 7 was
7  marked for identification.)
8  BY MR. USHIRODA:
9      Q. Okay. Dr. Bateman, I've handed you what I've
10 marked as Exhibit 7 to your deposition.
11     Could you please identify that for the record?
12     A. This is an e-mail that I sent on February 9th,
13 '08 Bruce and Stan.
14     Q. And in this e-mail, are you sharing your
15 thoughts on your review of the March 8th Ninth Circuit
16 decision?
17     A. Yes.
18     (Whereupon, Defendants' Exhibit 8 was marked
19 for identification.)
20 BY MR. USHIRODA:
21     Q. Okay. Dr. Bateman, I'm handing you what I've
22 marked as Exhibit 8 to your deposition.
23     Could you please identify that for the record?
24     A. This is an e-mail sent by me to Stan on May
25 15th, '08 dealing with the design claim.

**183**

1      Q. I notice that you have an Exhibit 8. Do you
2  have a list of educational program designs that it
3  lists, and it's listed A through E?
4      A. Correct.
5      Q. Okay. And I guess that list is before you
6  revised it?
7      A. It's at one stage of the evolution of the list;
8  that's correct.
9      Q. That's all I wanted to find out.
10     A. That's correct.
11     Q. So that is pre-three-by-five note card, right?
12     A. Yes, that's right.
13     Q. Okay. Which is Exhibit 4.
14     Now, if you go back to Exhibit 7, I think about
15 a third-of-the-way down. And the sentence starts in the
16 middle. The deliberate indifference standard seems to
17 me to be easily met on the Horsley facts. So we have
18 clear sailing to show that the horrendous story of
19 misdiagnoses and utter failure to provide
20 autism-specific services constitute a denial of
21 meaningful access to public education.
22     Did I read that correctly?
23     A. Almost. It's "history" rather than "story."
24     Q. Yeah. Okay. Now, the deliberate indif --
25 you've already talked to me about some of the facts that

**184**

1  you based your conclusion that the DOE was deliberately
2  indifferent to Michelle and Natalie based upon their
3  denial of -- failure to provide autism-specific
4  services.
5      Are there any other Horsley facts that you're
6  aware of?
7      A. Oh, heavens, yes.
8      MR. LEVIN: Objection; misstates testimony.
9  BY MR. USHIRODA:
10     Q. Okay. What -- what other factors -- what other
11 Horsley facts are there that causes you to conclude that
12 the deliberate indifference standard seems to be easily
13 met?
14     A. The failure to monitor the girls' progress.
15 Even if, for the sake of discussion, we say that --
16 let's say it was accidental that they got in -- got put
17 into the program that was not autism-specific. Had they
18 monitored the girls' progress, lack thereof, as was
19 required, they would have very quickly known, hey,
20 something isn't working. Something would have been
21 changed. A failure to monitor progress and to make
22 changes consistent with the best we know at the time is
23 a huge failure.
24     Q. Okay. What other facts?
25     And the reason I ask is because I had asked

**185**

1  this question before, but until -- but you hadn't
2  mentioned that -- this monitoring -- lack of monitoring
3  to me as a fact that supported deliberate indifference.
4  So when I showed you this e-mail, this seemed to prompt
5  some more recollection.
6      I'm just trying to find out all the facts that
7  you based your conclusion upon, that the DOE was
8  deliberately indifferent by virtue of failing to provide
9  an autistic-specific service.
10     A. May I -- may I refer back to Exhibit 6, please?
11     Q. Sure.
12     A. I believe the fact that they failed to provide
13 highly qualified teachers at every stage, that they
14 failed to provide highly trained aides at every stage.
15 There is no disability, to my knowledge, with the
16 possible exception of deaf blindness. That necessitates
17 the degree of training and expertise that autism does.
18     Q. Okay.
19     A. The fact that they didn't use proven effective
20 programs, we have already discussed. Failure to monitor
21 progress, I just spoke of. Ongoing professional
22 development, to the best of my knowledge, was sporadic,
23 if at all. Very limited, if and when it did occur. Not
24 always attended by the people who were working most
25 closely with the girls.