**ROBERT C. MARVIT, M.D.**
**1314 S. KING STREET, SUITE 862**
**HONOLULU, HAWAII  96814**
**Telephone:  (808) 591-2420**
**Fax:  (808) 591-2423**

**August 12, 2008**

**Preliminary Complex Medical Evaluation**

**Re: H⬛⬛⬛, Mark**

**Gary Suganuma**
**999 Bishop St 23rd Floor**
**Honolulu HI  96813-4428**

**Statement of the Problem:**

This is a 43 and a half year-old married man who is claiming emotional distress as a result of his interactions with the Department of Education to get services for his autistic daughters.

**Current Examination:**

He was examined on June 3, 2008 and was cooperative throughout the entire examination. Mental status examination did not reveal any signs or symptoms of organic brain disease, psychotic thinking.  His affect was appropriate.  There were no manifest psychopathological trends.  Body kinetics was also normal.  No affective disturbance, anxiety, or depressive symptomatology.  His primary care is with Dr. April Leong at Kaiser.  He's taking Lisinopril, Zocor and aspirin.  This is for his blood pressure, elevated lipids, and cardiac preventions.  His diabetes is diet-controlled.

He's taking his pilot license examination and has one more lesson to go to solo flight.  He started ground school some 25 years ago; it's always been a dream of his that he's now managed to fulfill.  He is flying a Piper Saratoga.

**Activities of Daily Living:**

He and his family live in a two-bedroom condominium in the Makiki area and they've been renting it for the past 6 years.  He is in an unusual occupation in that he's Driver, Personal Assistant, and Security Chief for a philanthropic elderly person.  He has been doing this for the past 5 years.  He may work as many ours as 60 per week, or as little as half of that, depending on

Re: H█████, M

- 2 -

circumstances. He's the Chief of the Staff of the houses she owns here. She travels 4-5 times per year to the mainland and occasionally he accompanies her.

He got the job in an extremely unusual fashion. Prior to 9-11, he had a marketing company that went out of business after 9-11. He met this woman when he was doing security as a Guard and was assigned to her place. She took a liking to him and he became her employee with a wide variety of benefits. Recreationally, he is fulfilling his dream of flying. He had a Halloween Store that was open a few months out of the year selling costumes. This was probably recreational as well as an economic activity. He does some things for web pages as well. He has a somewhat varied and fully functional /operational life.

**Reported Somatic Review of Systems:**

He developed some constant headaches in January or February of 2006; two years ago. They were circumferential in location, lasting 4-5 months. MRI, CT scan, and imaging found nothing. Now they occur 2-3 times per week with shorter duration. Visually, he's only presbyopic. He has no complaints about hearing, smell, taste, chewing, or swallowing. He has no vertigo, shortness of breath; he's never smoked, and has no cardiovascular symptoms.

He's 5' 9½ " and weighs 275 pounds, which has been his weight, more or less for the past 4 or 5 years. He has some urinary frequency which sounds like prostatism. He reports his libido as being fair. He has no dermatologic difficulties. He has some left knee problems and bone spurs in both heels as a result of army duty 15 years ago.

His sleep is intermittently interrupted when he's stressing or obsessing about things. He has no specific cortical function complaints in that he has to take notes from his employer and has to remember a wide variety of things. States he has a low frustration tolerance ordinarily, but the children have taught him patience. He feels that his wife receives the brunt of his frustrations since he can't release it at work. Also, on his days off, she tends to control him and micromanage his life, which is a source of frustration as well.

**Reported Past Medical History:**

He was born in Murray, Utah, and grew up in the Los Angeles area from the age of 2 ½. As a child, he tonsillectomy when he was 12. As an adult, in 1992, he had his heel injuries in the service, and has a 10% Service-connected disability. In 2004, his elevated blood pressure, diabetes, and hyperlipidemia were discovered. Apparently he was drinking Mountain Dew and had blurred vision. His blood sugar level was 360.

He has no known allergies.

**Family History:**

Father is 74 years old, and has angina, treated with nitroglycerine. He also has hypertension and short term memory problems. He worked as a banker. Mother is 74 years old, has hammer toes and was a secretary. He has 5 siblings. He has a sister aged 47 who has 10 children; another

Re: H▬▬, M

- 3 -

sister aged 45 who is self-employed. Below him is a sister aged 41, who works for the Air Force, another sister age 39 who is with a furniture store. He has a brother age 37 who works as a Controller. Kidney stones seem to run in the family. Their religion is 5th generation Mormon.

## Background:

He graduated from Northview High School in 1983. He was a B student. He took some general education courses at a community college for a year and a half and went on his mission to Japan. Then he returned to Japan to do language for a year. He worked as a Tour Guide in Los Angeles for five and a half years and met his wife to be. She was on a chartered tour and was the Tour Guide as it was a private tour. They had a phone call romance and he was running telephone bills for about $800 a month. She quit her job in Japan and went to Los Angeles and stayed with his parents while they were engaged. She converted to Mormonism, at her request. They were married in December 1989. She was not a US Citizen. After they got married, he continued in Los Angeles for six months, doing tours six days a week.

He then joined the Army to fly helicopters. This was in August of 1990; he went in November of 1990. He started in the Infantry, hoping to switch to flying. He was sent to Schofield and was put in an airborne unit. He did the minimal five jumps, which resulted in some of the difficulties with his heels. There was a military cutback, so he got out. After discharge in 1992, he started working at Waimea Valley doing ATV Tours for 2 ½ years. Then he did some marketing in Waikiki to the Japanese. This was late 1994 to late 2000, when he went self employed. This lasted six month after 9-11.

## Regarding the Children:

The first child, Michelle, was born in February of 1991. The diagnosis occurred at 33 months. First there was the question of language delay. They wondered whether it was secondary to the fact that two languages were spoken at home, English and Japanese. The motor skills seemed to be ok, but at twenty four months, she still had limited speech, both expressive and receptive. Hearing was tested, and that was alright. The doctor at Kaiser did the diagnosis. Their next child, Natalie, was born in August of 1992. Her diagnosis was done at fourteen to fifteen months by Maggie Coven. The older child was in Special Ed Preschool. When Michelle, had a second review classification, they met with a Masters student, who interviewed him. He felt this was being short shifted. Natalie was coming up, so he had her see Dan Le Gof. The Therapeutic Assistants were doing the treatment and these things were occurring around June 1998. Litigation Due Process Hearing was November 1999. The Order came out in February of 2000. In the interim, there was stated in the IEP Special Education. They were only getting speech therapy an hour a week and there were logistic problems. The Order was to get services at the school from 2000 on. The girls do well in a controlled environment. They had temper tantrums until they were 4 years old. Michelle is in school from 08:00 a.m. to 4:00 p.m. and Saturday they do some social programs from 9:00 a.m. to 4:00 p.m. There is a Therapist at school. Each girl was getting 60 hours plus, with up to 5 Aids in Therapy. They are also doing Bible Studies, Social and Religion. There is a question of music lessons and they can mimic lyrics. Natalie supposedly has perfect pitch, and Michelle loves music but has a poor tone sense

Re: H█████, M

- 4 -

He and his wife don't argue about discipline. The trip to Japan earlier on was stressful. They did a California trip three years in a row. His parents have a time share in Hawaii, so they have come over for 5 of the last 7 years. They saw Loretta Lukins who did a Life Care Plan. She apparently is a Rehab Nurse.

## Current Neuropsychiatric Testing:

Psychosocial Report indicates that he focuses primarily on areas other than marriage, family, mood, physical condition, and so forth. He says he is also plagued with difficulties associated with self-confidence and work. Developmental History indicates he was raised by his natural parents, describes his childhood as being happy, his mother as warm, understanding, and affectionate; father is warm, strict, and understanding. Parental relationship was described as happy, loving and close. He was a middle child. There were 6 other children. As a child, he was shy, active, nervous, and rebellious. During childhood he had excessive fears, worries, physical and medical problems, as well as a fear of failure. Parents never argued, father worked as an office worker as well as his mother. Discipline was fair and fairly strict. Childhood fears were of failing. Sexual experiences were reported to be pleasant.

He reportedly graduated from college with a 4-year degree and rates his intellectual ability as superior, if not gifted. He never repeated a grade; got A's and B's, never got into trouble at school, no problem with math or reading, and was no more the brunt of teasing than other children. Economically, he grew up in a middle class family with little disagreement about finances. Reports no change in income in the last two years. Providing enough income is not an important stressor. He finds his work to be enjoyable; he's never been fired, never laid off, and he's really doing personal service.

He was in the Army for two to four years, not in a combat zone. He was an enlisted man, received an honorable discharge. He has a Service-connected disability, never had mental health treatment. Never used illegal drugs or alcohol, no family history of addiction. No family reportedly have disturbed mental faculties. Did not have serious illness as a child. Has high blood pressure, but rates his health as being good.

He's married for more than fifteen years. He has two children. Behavior problems of the children occur. He describes his wife as happy, but fault finding. Frequency of sex is not a problem. Arguments occur several times a week. Relationship has never been threatened by an affair. They share interests of children, hobbies, crafts, movies, and television. She fulfills her role fairly well. He eats a balanced diet but does not exercise regularly, and currently he is a bit overweight. He's never been involved in civil matters or arrested; rates ability to cope with existing stressors as good. Describes himself as shy, easy-going, responsible and serious; his mental state is tense, worried, and unenthusiastic.

His Coolidge Assessment Battery showed some elevations in depression and complaints in memory and concentration. He had some elevation in emotional lability and poor planning.

Impact of Events Scale was moderately high. Beck Depression Inventory was mild to moderate.

Re: H█████, M

- 5 -

Post traumatic stress classification is measured by the Trauma Symptom Inventory, but his response did not indicate post traumatic stress. Similarly, his stress test on the Symptom Inventory Checklist showed mostly depressive and somatic complaints of a limited nature. His MMPI-2 was a valid profile. His profile was in the normal range, suggesting that he views his current adjustment as adequate. He has some personality characteristics such as great conscientiousness, a tendency toward self-doubt, which make him vulnerable to develop symptoms of anxiety or tension under stress. Again, no reported pattern of post traumatic stress.

**Record Review:**

The medical records from Kaiser indicate that he was working as a Tour Escort at Waimea Falls Park, and had a history of kidney stones, and a family history of kidney stones. He was given various H2 inhibitors for his gastritis. Nutritional counseling for weight. Strong family history of high blood pressure and angina, Cancer, and diabetes. His medical records don't indicate any emotional difficulties, and, as a matter of fact, his diabetes was not necessarily out of control as was implied by Beverly James suggesting that somehow post traumatic stress disorder will alter blood sugar.

In the three volumes of his deposition, Mark H█████ did not report a psychiatric disorder, but rather appropriate disappointment and unhappiness with the way things have been managed. There is no evidence that there was any psychiatric, psychological, or even social worker intervention for any alleged mental dysfunctions experienced by Mr. H█████.

Beverly James is a "Licensed Clinical Social Worker" who is semi-retired and has not had a clinical practice, that is ongoing treatment of patients or clients, for many years. Her opinions regarding the parents involved in this litigation, i.e., the H█████ and the L█████, have labeled them as suffering from Post Traumatic Stress Disorder as a psychiatric disorder, which she believes is permanent. The stressor is fundamentally the belief or idea that these parents have, that their children would be different, i.e. in some way better, if they have received some services during a 4-year period when their children were diagnosed.

Though unlike the definition of Post Traumatic Stress Disorder, where there is an exposure to a traumatic event in which both the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or threat of physical integrity, self, or others, and the person's response involved, intense fear, helplessness, or horror. In this instance, the criterion for the stressors is dealing with the bureaucracy of the Department of Education. She is also willing to say that there is depression as well. She does not attribute any of this to being parents of a disabled child or children. She admittedly is not a Physician, although is proclaiming to be an expert in Post Traumatic Stress Disorder especially as it affects the central nervous system and neurological functioning of the brain. The issue of parental care of a child or children with developmental disabilities not being a factor in these people's condition is difficult to understand. Caring for these children are enormous responsibilities that far exceed that of typical parental care. These parents have adapted to a situation caring for this disability and the adaptation to their children's disability involves a complex nature of stress processes that must be accounted for and constructs and factors that play a role in their lives has not really been addressed by her.

Re: H█████, M

- 6 -

Evidence suggests that there is considerable variation how caregivers adapt to their care giving demands. Many studies have sought to clarify or qualify the association between caregiving and the health outcomes of the caregivers.  Contextual factors, such as socioeconomic status, child factors such as child behavior problems and severity of disability, intrapsychic factors, such as mastery and self-esteem, coping strategies and social support have all been associated with psychological and or physical outcome with the parents who are the primary caregivers. (References: Blacher J., Sequential Stages of Parental Adjustments with the Birth of a Child with Handicaps:  Fact or Artifact?  Mental Retardation, 1994; 22:55 – 68.  Breslau, N., Straruch, K.S., Mortimer, E.A., Jr., Psychological Distress in Mothers of Disabled Children.  American Journal of Disabled Children, 1982; 136: 682-686.)  For each individual, there may exist a number of psychosocial mechanisms that regulate the impact of stress on impact and wellbeing.  The characteristics of a caregiver, the recipient of care, their shared history, and the social, economic, and cultural contexts within which they find themselves combine to create an infinite variety of circumstances from which stress may both originate and be managed.  Nonetheless, there are implications arising from the role itself that help explain some of the common patterns of stress and stress outcomes in caregivers.  Individuals typically occupy multiple roles in life, such as family roles and occupational roles.  Being a caregiver of a child with a long term disability introduces an additional role, and therefore, will require some rearrangement of priorities, and redirection of energy.  Not only is this likely to produce strain at a personal level, but it is also likely to spur reactions (potentially negative) from various people who are interconnected to a person through his or her roles, outside the realm of caregiving.  This stress can be understood to arise at the level of provision of care, as well as in other areas of life.  Much of the literature tends to focus on stress related to direct provision of care, (References Aneshensel, C.S.; Pearlin, L.R.; Mullen, J. T.; Zarit, S.H.; Whitlatch, C.J., Profiles in Caregiving:  The Unexpected Career.  San Diego Academic Press, Inc.; 1995.  McKinney, B. Peterson, R.A. Predictors of Stress in Parents of Developmentally Disabled Children.  General Pediatric Psychology 1987; 12:133-150.)

Ms. James has not addressed any of these issues; rather, she has labeled these people as suffering from a diagnostic classification which has been inappropriately applied.  Even a cursory review of the literature would recognize that the requirements of a stressor to qualify for a Post Traumatic Stress Disorder has to be outside the normal realm of human experience, not like losing a job or getting divorced.  Rather, being on an airplane where the roof comes off, or being shot in a bank robbery and survive, or if even if you're in the military having an improvised explosive device blow up near you are sufficient stressors.  Dealing with a bureaucracy as a qualifying stressor for Post Traumatic Stress Disorder would, in fact, make every citizen here who pays taxes, or even who doesn't pay taxes, be suffering from post traumatic stress.  Her other opinion that the additional characteristic of the stressor is the parental belief that things would be different if they got some somewhat unspecified service based on what they've been told by unnamed experts.  Well if every belief we had that things could be different could qualify for a stressor for Post Traumatic Stress Disorder, again, everyone would be suffering from this disorder.

Re: H██████, M

- 7 -

I'm familiar with Beverly James, and I find that her work with attachment disorders is commendable, but in this instance her partisan advocate role is without merit or substance from a reasonable medical probability perspective.

## Impact of Managing Autism in Children :

The basic issue in looking at the parents of autistic children or children with severe developmental disabilities is to separate out, if possible, the effect of dealing with bureaucracy versus the 24-hour/7-day a week responsibility of being a caregiver and caretaker of a severely disabled child and/or children.

## Formulation Sumary and Opinons:

All the following things are rendered with reasonable medical probability:

1. Mark H█████ does not suffer from a diagnosable of psychiatric, emotional, or mental disorder

2. He has genuine and appropriate reality-based concerns about his children. This is not a mental illness.

3. His current situation is determined by a variety of factors, but they do not, in of itself, represent a determinant of a psychiatric condition.

4. His interactions with the D.O.E. were frustrating, but did not generate any mental illness. He was distressed, frustrated, and angry, but not to the degree that he suffered any impairment in meeting the demands of his everyday life.

5. Other factors that contribute to his overall state include his two children and their condition, as well as his employment demands.

6. There is no fundamental evidence to indicate that he suffers from post traumatic stress disorder, as has been articulated in the current edition of the Diagnostic and Statistical Manual of the American Psychiatric Association, DSM IV-TR.

7. Rie H█████ does not suffer from a diagnosable emotional, mental, psychological, and/or psychiatric disorder.

8. She's coping quite well with the home situation and her outside activities.

9. Her current situation is clearly demarcated by the circumstances of her life, both historically as well as longitudinally to the present time. This does not represent a psychiatric disorder.

Re: H⬛⬛⬛, M

- 8 -

10. Her interactions with the Department of Education were frustrating, stressful, difficult, and anger-provoking, but did not develop into a specific diagnosable or treatable psychiatric disorder.

11. There is no evidence, whatsoever, to suggest that she suffers from post traumatic stress disorder, or a condition that would even minimally resemble that category as is articulated in the Diagnostic and Statistical Manual of the American Psychiatric Association, version IV-TR.

12. The substance and basis of these conclusory opinions have been described in the preceding narrative and I shall be available to expand in a deposition, on each and every one of the issues that have been articulated in this regard.

If you have any further questions regarding this, please let me know.


Sincerely,


Robert C. Marvit, M.D.

ROBERT C. MARVIT, M.D.
1314 S. KING STREET, SUITE 862
HONOLULU, HAWAII  96814
Telephone:  (808) 591-2420
Fax:  (808) 591-2423

August 21, 2008

## Complex Medical Evaluation

### Re: H█████, Rie

**Gary Suganuma**
**999 Bishop St 23rd Floor**
**Honolulu HI  96813-4428**

## Statement of the Problem:

This is a 47 year-old Japanese married woman who has two teenaged daughters who have autism.  She's being evaluated the impact on her neuropsychiatric status regarding the two autistic children's treatment by the Department of Education during that four year period from 1994 through 1998, or thereabouts.  The question is: What, if any, psychiatric problems did she have as a result of her interactions with the Department of Education, as opposed to caring for developmentally impaired children and other factors in her life?

## Current Examination:

She was examined on July 3, 2008 and with the aid of a translator, was able to cooperate with the examination.  Because of time constraints, the exam was continued to be complete.  The only medication she takes at the present time are birth control pills.  Primary care is at Kaiser with Dr. O'Conner.

## Activities of Daily Living:

She is a housewife, takes aikido and classical ballet as part of her recreational activities.

## Reported Somatic Review of Systems:

She gets headache once in a while.  Visually, she's somewhat myopic, but this is corrected.  She has no hearing, taste, chewing, and swallowing, or pulmonary/cardiovascular complaints.

She's 5'3", weighs 136 pounds, has had no gastrointestinal complaints. She has intermittent urinary frequency. Gynecologically, she's normal and reports that her libido is also normal. She has a basically negative review of systems, including sensory and does not complain of sleep disturbances. She feels that there is some diminished memory and concentration and she gets emotional when things don't go her way. Recreationally, she's working writing novels, which are science fiction in nature.

**Reported Past Medical History:**

She was born Tokyo, Japan, denies any accidents, injuries, or traumas as a child. As an adult she's been pregnant twice and had full-term normal deliveries.

**Family History:**

Her father is 73; he's a glass contractor. Mother is 70 and a housewife. No major illnesses in the family. She has a brother, aged 37, who is in good health and is working in a labor-type occupation.

**Background:**

She graduated from high school in 1980. She worked in a bank in Japan doing basically data entry type work. She got into the travel services business when she was in Hawaii.

She got married in December of 1989. She's not easily influenced by others, and tends to be an in-charge, if not a take-charge type person.

She has very practical expectations and certainly has accepted autism. She subscribes to the philosophy of no expectations, no disappointments. The issue began with the children when they did not speak well. She and her husband wondered whether it was because they were bilingual versus something else. Educationally, they failed to move ahead. She felt that the critical period was in preschool through the 3rd grade. They supposedly had some services with skills trainers, full-time, but the D.O.E. failed to inform them these services were available. She felt that those children that got those services got much better than her girls. They also failed to inform her about the availability of interpreters. The children showed gradual improvement from the 4th grade on. She said, "We didn't know what to do during the preschool through 3rd grade time." She feels that perhaps it would've been the difference between night and day, had the children gotten their needed services, which were somewhat unspecified by her.

She had been living in Makiki since 1998. She lived in Waikiki in an apartment before that, and Mililani and Waialua, going back to 1991. She was in Los Angeles in 1991 where she had a lot of labor intensive jobs like waitressing. She converted to Mormonism before she got married, as her husband comes from a strong Mormon background. She can understand English fairly well, but she can't speak it as well as she would like. She speaks Japanese with her husband at home. Her daughters are involved in the church and go to Sunday school. The daughters were in the Zero To Three Program from the Hawaii State Department of Health. After that time, her

Re: H████, R
- 3 -

limited English and the difficulties with finding autism services, especially when they were moving, became more of a problem.

## Current Neuropsychiatric Testing:

Psychosocial Report indicates that the primary problem is related to family. Developmental history is described as happy and secure, but her mother was characterized as uncaring, but her father as warm. Parental relations were full of conflict. There is one other child in the family; she was the oldest. Growing up, she was outgoing and active and childhood fears included having her feelings hurt and failing. Parents argued about money. Father worked as a professional and her mother was a homemaker. She feels neutral about sexual experiences. She graduated from high school and rates her intellectual ability as average. She's never repeated a grade. She does not recall getting into trouble in school. Learning to read and doing math was no problem.

Economic status during childhood was working-class. Having enough income is an important stressor, currently. She's never been fired or laid off. She's mostly done office work. No use of substances or mind altering substances. No family members with psychiatric disorder; her general level of health is rated as excellent. She takes no real medication, other than birth control pills. Marriage is good; arguments occur once a week; they share common interests, he fulfils his role fairly well. She eats a balanced diet and regularly exercises. She's never been implicated in civil matters or arrested. She rates her ability to cope with existing stressors as good. Describes herself as outgoing, active, and aggressive, and her mental state as tense, worried, and distrustful.

Her Beck Depression Inventory is clearly in the mild range. Her Impact of Events Scale is also in the mild to moderate range. Symptom Inventory Checklist indicates a variety of somatoform, depressive, and to some extent, anxiety complaints.

Her Coolidge Assessment Battery indicated some elevations in dependant personality with compulsive and paranoid traits. Her anxiety level on Axis I was elevated. She also had elevations in language, memory, concentration, and neuropsychological difficulty. This again may be cultural as well as a language problem. There was a denial of any executive function decline. There is some introversion and emotional lability.

## Record Review:

Her primary care is with Kaiser, and that included her pregnancy. 1992 she was listed as a Housewife; she previously received care at Tripler, apparently, with her husband being in the military at the time. There's no mention in the Kaiser records of emotional difficulties, depression, or post traumatic stress complaints.

November 26, 2002 report by Dr. Jonathan Briskin concluded that she had an adjustment disorder with mixed anxiety and depressive mood, and this was chronic, due to a large number of significant stressful effects and situations. The stressor included caring for two children with intellectual disability and autism. He included a variety of references to the effect. Also, she has

stress related to the interaction between her husband and the Department of Education, which were frustrating and numerous over a prolonged period of time. An additional stressor was that her parents divorced shortly after her marriage to Mr. H██████, and since that divorce, she's had no contact with her mother. Her only contacts are with her father or brother who reside in Japan. She continues to voice anger towards her mother for leaving her father.

Beverly James Rebuttal Report is a carbon copy of the one she did for the L██████, saying that Dr. Briskin mislabeled them because they really had post traumatic stress disorder. She noticed that the children had made progress in learning, which had been slow and hard; she believes that the psychological disorder of post traumatic stress disorder did not exist until 1998, and continues, unabated. There's been no treatment for it. Her subsequent Psychosocial Updated Summary Report, dated May 29, again is a replication of lost opportunities to improve their children's ability to communicate. Based on her pronouncements in the deposition, she's sticking to these non substantive personal opinions.

Beverly James is a "Licensed Clinical Social Worker" who is semi-retired and has not had a clinical practice, that is ongoing treatment of patients or clients, for many years. Her opinions regarding the parents involved in this litigation, i.e., the H██████s and the L██████, have labeled them as suffering from Post Traumatic Stress Disorder as a psychiatric disorder, which she believes is permanent. The stressor is fundamentally, the belief or idea that these parents have, that their children would be different, i.e. in some way better, if they have received some services during a 4-year period when their children were diagnosed.

Though unlike the definition of Post Traumatic Stress Disorder, where there is an exposure to a traumatic event in which both the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or threat of physical integrity, self, or others, and the person's response involved, intense fear, helplessness, or horror. In this instance, the criterion for the stressors is dealing with the bureaucracy of the Department of Education. She is also willing to say that there is depression as well. She does not attribute any of this to being parents of a disabled child or children. She admittedly is not a Physician, although is proclaiming to be an expert in Post Traumatic Stress Disorder especially as it affects the central nervous system and neurological functioning of the brain. The issue of parental care of a child or children with developmental disabilities not being a factor in these people's condition is difficult to understand. Caring for these children are enormous responsibilities that far exceed that of typical parental care. These parents have adapted to a situation caring for this disability and the adaptation to their children's disability involves a complex nature of stress processes that must be accounted for and constructs and factors that play a role in their lives has not really been addressed by her.

Evidence suggests that there is considerable variation how caregivers adapt to their care giving demands. Many studies have sought to clarify or qualify the association between caregiving and the health outcomes of the caregivers. Contextual factors, such as socioeconomic status, child factors such as child behavior problems and severity of disability, intrapsychic factors, such as mastery and self-esteem, coping strategies and social support have all been associated with psychological and or physical outcome with the parents who are the primary caregivers. (References: Blacher J., Sequential Stages of Parental Adjustments with the Birth of a Child with

Re: H█████, R

- 5 -

Handicaps: Fact or Artifact? Mental Retardation, 1994; 22:55 – 68. Breslau, N., Straruch, K.S., Mortimer, E.A., Jr., Psychological Distress in Mothers of Disabled Children. American Journal of Disabled Children, 1982; 136: 682-686.) For each individual, there may exist a number of psychosocial mechanisms that regulate the impact of stress on impact and wellbeing. The characteristics of a caregiver, the recipient of care, their shared history, and the social, economic, and cultural contexts within which they find themselves combine to create an infinite variety of circumstances from which stress may both originate and be managed. Nonetheless, there are implications arising from the role itself that help explain some of the common patterns of stress and stress outcomes in caregivers. Individuals typically occupy multiple roles in life, such as family roles and occupational roles. Being a caregiver of a child with a long term disability introduces an additional role, and therefore, will require some rearrangement of priorities, and redirection of energy. Not only is this likely to produce strain at a personal level, but it is also likely to spur reactions (potentially negative) from various people who are interconnected to a person through his or her roles, outside the realm of caregiving. This stress can be understood to arise at the level of provision of care, as well as in other areas of life. Much of the literature tends to focus on stress related to direct provision of care, (References Aneshensel, C.S.; Pearlin, L.R.; Mullen, J. T.; Zarit, S.H.; Whitlatch, C.J., Profiles in Caregiving: The Unexpected Career. San Diego Academic Press, Inc.; 1995. McKinney, B. Peterson, R.A. Predictors of Stress in Parents of Developmentally Disabled Children. General Pediatric Psychology 1987; 12:133-150.)

Ms. James has not addressed any of these issues; rather, she has labeled these people as suffering from a diagnostic classification which has been inappropriately applied. Even a cursory review of the literature would recognize that the requirements of a stressor to qualify for a Post Traumatic Stress Disorder has to be outside the normal realm of human experience, not like losing a job or getting divorced. Rather, being on an airplane where the roof comes off, or being shot in a bank robbery and survive, or if even if you're in the military having an improvised explosive device blow up near you are sufficient stressors. Dealing with a bureaucracy as a qualifying stressor for Post Traumatic Stress Disorder would, in fact, make every citizen here who pays taxes, or even who doesn't pay taxes, be suffering from post traumatic stress. Her other opinion that the additional characteristic of the stressor is the parental belief that things would be different if they got some somewhat unspecified service based on what they've been told by unnamed experts. Well if every belief we had that things could be different could qualify for a stressor for Post Traumatic Stress Disorder, again, everyone would be suffering from this disorder.

I'm familiar with Beverly James, and I find that her work with attachment disorders is commendable, but in this instance her partisan advocate role is without merit or substance from a reasonable medical probability perspective.

## Impact of Managing Autism in Children :

The basic issue in looking at the parents of autistic children or children with severe developmental disabilities is to separate out, if possible, the effect of dealing with bureaucracy versus the 24-hour/7-day a week responsibility of being a caregiver and caretaker of a severely disabled child and/or children.

Re: H█████, R

- 6 -

**<u>Formulation Sumary and Opinons:</u>**

All the following things are rendered with reasonable medical probability:

1. Rie H█████ does not suffer from a diagnosable emotional, mental, psychological, and/or psychiatric disorder.

2. She's coping quite well with the home situation and her outside activities.

3. Her current situation is clearly demarcated by the circumstances of her life, both historically as well as longitudinally to the present time. This does not represent a psychiatric disorder.

4. Her interactions with the Department of Education were frustrating, stressful, difficult, and anger-provoking, but did not develop into a specific diagnosable or treatable psychiatric disorder.

5. There is no evidence, whatsoever, to suggest that she suffers from post traumatic stress disorder, or a condition that would even minimally resemble that category as is articulated in the Diagnostic and Statistical Manual of the American Psychiatric Association, version IV-TR.

6. Mark H█████ does not suffer from a diagnosable of psychiatric, emotional, or mental disorder

7. He has genuine and appropriate reality-based concerns about his children. This is not a mental illness.

8. His current situation is determined by a variety of factors, but they do not, in of itself, represent a determinant of a psychiatric condition.

9. His interactions with the D.O.E. were frustrating, but did not generate any mental illness. He was distressed, frustrated, and angry, but not to the degree that he suffered any impairment in meeting the demands of his everyday life.

10. Other factors that contribute to his overall state include his two children and their condition, as well as his employment demands.

11. There is no fundamental evidence to indicate that he suffers from post traumatic stress disorder, as has been articulated in the current edition of the Diagnostic and Statistical Manual of the American Psychiatric Association, DSM IV-TR.

Re: H███████, R

- 7 -

12. The substance and basis of these conclusory opinions have been described in the preceding narrative and I shall be available to expand in a deposition, on each and every one of the issues that have been articulated in this regard.


If you have any further questions about this, please let me know.

Sincerely,

Robert C. Marvit, M.D.

Re: H█████, M&N
- 1 -

ROBERT C. MARVIT, M.D.
1314 S. KING STREET, SUITE 862
HONOLULU, HAWAII  96814
Telephone:  (808) 591-2420
Fax:  (808) 591-2423

August 21, 2008

<u>Follow-up</u>

<u>Re: H█████, Michelle and Natalie</u>

**Gary Suganuma**
**999 Bishop St 23rd Floor**
**Honolulu HI  96813-4428**

I had previously reviewed the records of Michelle and Natalie in May of 2001.  I have again reviewed my report at this time.  In addition, I have recently reviewed the current reports of the Department of Education Individualized Educational Program starting in 2007, legal consultants Special Education Barbara Bateman, a report dated May 29, 2008; report dated May 10, 2004 from Douglas Houck, educational expert from the plaintiff; Daniel LeGoff evaluation dated June 6, 2008; Jay Lucker an audiologist reporting on September 2003, as well as school based behavioral reports and reports from C.A.R.E.

There are several DVDs that are related to a day in the life of Michelle and Natalie, which were viewed as well as various and other sundried reports and records.  Complete listing of all materials provided for the evaluation of Michelle and Natalie are appended as well as another appendage of the records supplied for the evaluation of Stephen and LaVerne L█████, as well as Mark and Rie █████.

Regarding the diagnosis for Michelle and Natalie, they clearly suffer from autism spectrum disorder in varying degrees of complexity.

The absence of the mental health or educational services that they allegedly not had been provided as outlined in the claim does not seem to have determined their current level of functioning.

There is some evidence to suggest that being placed in a mainstream educational setting is, in fact, more appropriate, although from the pragmatic perspective, it is frequently unrealistic.  If they had been given the claimed services, one could not say that they would have been capable of being mainstreamed.

Re: ███████, M&N

- 2 -

Although the plaintiff's experts have all testified and reported that delays in providing the services caused irreparable harm, there is no documenting and scientific evidence to support that claim. One can quote the literature ad nauseum, on both sides of the fence, but the reality is that every child is different. They have the term autism spectrum disorder to clearly describe the fact that it is not a single entity. This includes the determinants of the condition, be it genetic, pre-natal, post-natal, toxic, metabolic, social, or otherwise, as well as the manifestations of the condition, irrespective of various deficits of communication disorders.

The two girls have done remarkably well, given the nature of their condition. Whether they would have done better or worse with the claimed services that were not provided is a theoretical construct. If one wants to argue that we do not know how they would have been if they got these services, then how can they claim that these services would have made a substantive difference? There has been some suggestion by various experts on both sides, that symptoms of autism typically emerge during the first 5 years of life, a period when a child normally picks up language, social skills, and other new abilities. Scientist call this kind of growth experience-dependant learning. In my opinion, it is associated with enormous changes in brain circuitry. Literature indicates that 300 genes switch on and off to regulate experience-dependant learning. Defects in any number of them could conceivably result in some symptoms of autism.

As I said, this is a spectrum disorder, and there may be hundreds of varieties of autism. It looks like almost every child with autism is different from the next. When discoveries have been made a different gene is mutated in almost every child. Autism, like most mental disorders, is defined by external behaviors, rather than clear biological understanding. To suggest that one form of intervention or another somehow alters a complex situation's outcome, is medically untenable.

I will be more than happy to elaborate on these opinions and the basis of these opinions in my oral deposition, if asked. Otherwise, my opinion stands as stated, with reasonable medical probability.

Sincerely,

Robert C. Marvit, M.D.

### Records Provided For Evaluation of Mark H. & Rie H. And For Records Review of Michelle H. & Natalie H.

- Deposition transcripts of Mark H. (Vols. I-III, conducted on 1/26/01, 6/7/03, and 6/14/03)

- Deposition transcript of Rie H. (conducted on 1/26/00)

- Subpoenaed records of Mark H. from Kaiser Permanente

- Subpoenaed records of Rie H. from Kaiser Permanente

- Mark H.'s Response to Defendants' Second Request For Answers to Interrogatories to Plaintiff Mark H. and Exhibits "1"-"6", dated 9/30/03

- Mark H.'s Supplemental Response to Defendants' Second Request For Answers to Interrogatories to Plaintiff Mark H. dated 11/10/03

- Rie H.'s Response to Defendants' Second Request For Answers to Interrogatories to Plaintiff Mark H. and Exhibits "1"-"6", dated 9/30/03

- Rie H.'s Supplemental Response to Defendants' Second Request For Answers to Interrogatories to Plaintiff Mark H. dated 11/10/03

- H██████ v. DOE administrative prehearing transcript (conducted on 1/6/00)

- H██████ v. DOE administrative hearing transcripts (Vols. I-III, conducted on 1/14/00, 1/19/00, and 1/20/00)

- Rebuttal report of Beverly James re: H██████ dated 5/19/04

- Updated Supplementary Report of Beverly James dated 5/29/08

- Beverly James Carriculum Vita

- Barbara Bateman 5/29/08 report

- Beverly James 5/19/04 rebuttal report

- Beverly James 5/29/08 Psychosocial Evaluation updated supplementary report

- Douglas Houck 5/10/04 report

- Douglas Houck 5/19/04 report

- Daniel Legoff 6/06/08 report (Michelle H.)

- Daniel Legoff 6/06/08 report (Natalie H.)

- Jay Lucker 9/26/03 report (Natalie H.)

- Jay Lucker 7/18/03 report (Michelle H. & Natalie H.)

- Richard Goka 7/10/01 report

- Jonathan Briskin 11/26/03 Report re: Mark H.

- Jonathan Briskin 11/26/03 Report re: Rie H.

- Curriculum Vitae of Jonathan Briskin, M.D.

- Kaiser Permanente records of Mark H., dated 5/29/01

- Kaiser Permanente records of Rie H., dated 5/29/01

- Barbara Bateman reports re: Michelle H. and Natalie H. dated 1/29/01 and 6/20/03

- Barbara Bateman Vita

- Carol Forsloff report re: Michelle H. and Natalie H. dated 7/11/03

- Catherine Critz outpatient consultation report re: Michelle H. for consultation on 7/10/03

- Catherine Critz outpatient consultation report re: Natalie H. for consultation on 7/10/03

- Daniel Legoff Neurodevelopmental Re-Evaluation report re: Michelle H. for evaluations on 4/23/04 and 4/26/04

- Daniel Legoff Neurodevelopmental Re-Evaluation report re: Natalie H. for evaluations on 4/23/04 and 4/26/04

- Daniel Legoff updated opinions re: Michelle H. and Natalie H. dated 7/7/03

- Daniel Legoff treatment issues re: Michelle H. and Natalie H. dated 1/5/01

- Daniel Legoff Curriculum Vitae

- Joan Hawkinson report re: Michelle H. and Natalie H. dated 4/23/04

- Joan Hawkinson Qualifications

- DVD [Dr. Dan #1 (34 min) #2 (14 min)]

- DVD [H██████ Home 4/12/01]

- DVD [Day in The Life of: The H█████ Girls, 6/3/03]

- DVD [H., Mark - Edit #1, 11/12/03]

- DVD [Day in the Life: Morning Routine, 7/14/00]

- DVD [Day in the Life: H█████ Girls - 4/2/03 (24 min) & Matthe Chu - 4/9/03 (14 min)]

- 05/05/94 Case Conference Summary (00044-00069)

- 07/11/94 IEP: total Service Plan; Addendum of 7/18/94 (HM00039-00050)

- 01/11/96 IEP (01524-01538)

- 06/29/95 IEP (01507-01519)

- 01/16/97 IEP (01551-01559)

- 04/03/97 Case Conference Summary Re-evaluation (01565-01584)

- 01/16/98 IEP (01590-01601 and 01590-01607)

- 01/21/99 IEP (01608-01624)

- ISPED 2000 Documentation of Eligibility (5MH 199)

- 12/08/99 Case Conference Summary, 12/08/99 Case Conference Recommendations, 11/17/99 Multidisciplinary/Behavioral Assessment by Ariadne Weaver/Eric Moto (00001-00007)

- 04/03/97 Case Conference Summary Reevaluation, 2/25/97 Educational Evaluation by Ariadne Weaver, 3/12/97 Speech/Language Re-Evaluation by Charlene McGraw; 3/12/97 Intellectual Evaluation by Lilian Morita, 2/11/97 Social Work Report Re-Evaluation by Charlene Luis and 1/13/97 Record Review Notes by S. Okumura, M.D. (01565-01584)

- 05/03/94 Report by Margaret Koven, Psy. D. (01465-01468)

- 07/07/95 IEP (HN00047-00049)

- 07/07/95 IEP (HN00054-00058)

- 07/07/95 IEP (00287-00298)

- 02/13/97 IEP (00409-00421)

- 02/13/99 IEP (00433-00448)

- 02/08/99 IEP (01892-01919)

- 09/06/94 Psychological Evaluation by Joyce Pobanz, Ph.D. (00234-00238)

- 09/21/94 Leeward Diagnostic Unit Conference Summary by Louise Iwaishi, M.D. (00590-00595)

- 05/22/95 Psychological Evaluation by Melanie Ching, M.A. (HN00019-00022)

- Records of CARE Hawaii, Inc. (SEED) (vols 1-10), dated 5/15/08

- Records of Daniel Legoff, C/R for CNNH - Exhibits Part I & II and Statement, dated 5/30/08

- Records of Daniel Legoff re: Michelle H. (vols 1 & 2), dated 1/18/01

- Records of Daniel Legoff re: Natalie H. (vols 1 & 2), dated 1/18/01

- Records of CARE Hawaii, Inc. (SEED), (vols 1-5), dated 8/12/03

- Records of SOH/DOH Developmental Disabilities Division, Case Management and Information Services Branch (Michelle H.), dated 6/04/08

- Records of SOH/DOH Developmental Disabilities Division, Case Management and Information Services Branch (Natalie H.), dated 6/04/08

- Records of SOH/DOH/Child Adolescent Mental Health Division (Natalie H.), dated 9/05/03

- Records of SOH/DOH/Child Adolescent Mental Health Division (Michelle H.), dated 9/05/03

- Records of Straub Clinic & Hospital (Michelle H.), dated 6/08/01

- Records of Straub Clinic & Hospital (Natalie H.), dated 6/06/01

- Records of Autism Partnership (Ron Leaf, Ph.D.), dated 7/27/01

- IEP Progress Reports, Assessments, etc. re: Michelle H. (Doc. Nos. 2DOE(MiH) 00001-01137)

- IEP Progress Reports, Assessments, etc. re: Natalie H. (Doc. Nos. 2DOE(NaH) 00001-00687)

- Records of Douglas Houck (Plaintiff's expert), Exhibits Part 1, 2 and 3, dated 6/02/08

## Records Provided For Evaluation of Stephen L. & LaVerne L.

- Records from Daniel S. McGuire, M.D. re: Stephen L.

- Records from Molokai Family Health Center re: Stephen L.

- Records from Molokai Family Health Center re: Laverne L.

- Records from Kapiolani Medical Center for Women and Children re: Laverne L.

- Jonathan Briskin Preliminary Report dated 11/26/03 re: Laverne L.

- Jonathan Briskin Preliminary Report dated 11/26/03 re: Stephen L.

- Robert Bart, M.D. Examination Summary of Aaron L., dated 10/22/81

- Robert Bart, M.D. Examination Summary of Aaron L., dated 12/23/81

- Robert Bart, M.D. Examination Summary of Aaron L., dated 4/06/82

- Robert Bart, M.D. Examination Summary of Aaron L., dated 9/03/82

- Robert Bart, M.D. Examination Summary of Aaron L., dated 6/20/84

- Robert Bart, M.D. Examination Summary of Aaron L., dated 12/04/84

- Robert Bart, M.D. Examination Summary of Aaron L., dated 8/12/85

- Robert Bart, M.D. Examination Summary of Aaron L., dated 9/22/86

- Jacqueline Finkboner, Ph.D. Psychological Report of Aaron L., dated 10/20/82

- John Briley, M.D. Pediatric Evaluation of Aaron L., dated 10/22/82

- John Briley, M.D. Conference Summary, dated 10/22/82

- David Roth, M.D. Psychiatric Evaluation of Aaron L., dated 12/10/03

- Peggy Murphy-Hazzard, Clinical Psychologist, Quarterly Report of Aaron L., dated 4/24/06

- Peggy Murphy-Hazzard 6/01/06 Psychological Evaluation of Aaron L.

- J. Hayashida Home Visit Report of Aaron L., dated 12/01/82

- Daniel McGuire, M.D. Evaluation of Aaron L., dated 8/18/99

- Diane Lessner Evaluation of Aaron L., dated 8/01/03

- Diane Lessner Evaluation of Aaron L., dated 8/08/03

- Kapiolani-Children's Medical Center Discharge Summary re: Laverne L., dated 9/14/81

**ROBERT C. MARVIT, M.D., INC.**
1314 S. King Street, Suite 759
Honolulu, Hawaii 96814
Phone: (808) 591-2420
Fax:    (808) 591-2423

-oOo-

August 8, 2001

George Hom, Esq.
235 S. Beretania Street, Room 304
Honolulu, HI 96813

Re:    Mark H. et al vs. Paul LaMahieu, et al.
Civil No. 00-00282 DAE/LEK

Dear Mr. Hom:

In response to your Memo of July 30, 2001, I respond as follows:

1.    Regarding qualifications in the diagnosis and treatment of autism, I would report
as follows:

I am a licensed physician, medical doctor trained in internal medicine, psychiatry,
neurology.  I have been a Fellow at the Harvard Law School, Harvard Laboratory of
Community Psychiatry and hold a Master's Degree in Behavioral Sciences from
Harvard.

Autism is a neurological disease with medical etiologies.  It is not a social disorder
despite its many social implications.  My background, training, education, and
experience in the medical field as well as in clinical practice involving both adults and
children who suffer from impairing neurobehavioral disorders spans over 30 years.  I
have worked with Child Protective Services, Developmental Disabilities, and during my
tenure as Research Director for the State Health Department was involved in a variety
of studies that related to disturbances in young children ranging from mental
retardation to autism.

Therefore, unlike the social workers, psychologists and attorneys, I have taken primary
medical care responsibility for patients, not clients, who suffer from these disorders and
have had to deal with everything from third-party payments to clarification of diagnostic

-1-

entities in the areas of concern. While it is true that at this point in my career I am not involved in the care and treatment of autistic children, this in no way precludes my understanding and keeping up in the field by attending seminars and continuing medical education issues that surround the problems attendant to autism, its treatment, and what would be construed as meaningful interventions.

2. Regarding the lack of references in my report, I will now provide a series of references that were used in this regard so that there would be no problems.

a. Outcome of Early Intervention for Children with Autism, authored by T. Smith, reported in *Clinical Psychology: Science & Practice*, Vol. 6, pp. 33-49, copyright 1999.

b. Works by Stanley I. Greenspan, Clinical Professor of Psychiatry, Behavioral Sciences of Pediatrics, George Washington University Medical Center in an all day workshop sponsored by Good Shepherd Rehabilitation Hospital of Allentown and Lehigh County Early Intervention Services on April 7, 1995 entitled, Is Autism/PTDD a Thing a Person Has? Can You Cure It By Training a Child to Act Normal? Should Early Intervention Focus on Teaching Compliance, or Is There a More Crucial and Appropriate Goal to Aim For?

c. The Neurobiology of Infantile Autism by Ron Ciaranello which appeared in the *NARSAD Research Newsletter*.

d. Handbook of Autism and Pervasive Developmental Disorders, Second Edition, edited by Donald J. Cohen, Fred Volkmar, New York, John Wiley & Sons, 1997, focusing on the chapter of Howland and Goods Report Outcomes in Adult Life.

e. Patricia Howland and Lynn Mawhood from St. Georgia's Hospital Medical Center, Department of Psychology, published March 6, 1998: Supported Employment Scheme for High-Functioning Adults with Autism or Asberger's Syndrome.

f. Research on Earth's New Treatments for Autism, Several Treatments or Combinations of Treatments are Under Intensity by Hugh MacIntosh, the *APA Monitor*, September 1999.

g. The Lovaas Approach Revisited by Mike Connor, 2000, which is a review article published from the NAS Surrey Branch. This compendium has many up-to-date references on the research and assessment of Lovaas and Discrete Trial Training.

h. For purpose of completion, the Policy Statement of the American Academy of Pediatrics which appeared in *Pediatrics, Vol. 107, No. 5*, May 2001, pp. 1221-1226, entitled, The Pediatrician's Role in the Diagnosis and Management of Autistic Spectrum Disorder in Children.

If for some reason this memo does not clarify the issues raised by the Plaintiff's attorneys, I would be glad to provide additional appropriate data to address whatever concerns might arise.

Sincerely yours,

Robert C. Marvit, M.D.

cme3q01markh.87

RCM:mk

ROBERT C. MARVIT, M.D., INC.
1314 S. King Street, Ste. 759
Honolulu, Hawaii 96814
Telephone: (808) 591-2420
Fax:        (808) 591-2423

May 8, 2001

George Hom, Esq.
Deputy Attorney General
235 S. Beretania Street, Room 304
Honolulu, HI 96813

Re:  **MICHELLE AND NATALIE H. vs. PAUL LeMAHIEU**

### RECORD REVIEW

## STATEMENT OF THE PROBLEM:

Michelle is 10 years old and Natalie is 8-1/2 years old and both have had diagnoses of autism. The State is being sued for depriving them of benefits under IDEA and FAPE during a period of time following their diagnoses.

Various records, testimonies, reports, evaluations and the like have been reviewed in order to determine what impact the services given had on these children and what, if any, predictable deficits, with reasonable medical probability, would have been avoided had alternative services been rendered.

The expert reports from the Plaintiff included Barbara Bateman, Ph.D., J.D.; Catharine (Church) Critz, Ph.D.;  Lew Freitas, Ph.D.,; Loretta Lukens, M.N., R.N., C.R.R.N., and Bryna Seigel. Also, Dr. Bateman's testimony at a hearing and the report of Daniel B. LeGoff, Ph.D.

Dr. Bateman's testimony as a professor of Special Education and an attorney, focused on the various inadequacies of the IEP's, the insufficiency of the services and the lack of behavioral issues being effectively addressed before educational concerns. She makes a point that since 1994 and earlier, training has to include Discrete Trial Training, applied behavioral analysis, Lovaas, TEACCH and a whole host of methodologies. She makes a point of early intervention with 30, 40, 50 and even 70

George Hom, Esq.
Re: Michelle and Natalie H. v. Paul LeMahieu
May 8, 2001
Page 2

hours a week of in-home Lovaas training, 10 hours a day, 7 days a week, 365 days a year. Behavior control is the issue, as well as the whole gamut of whatever services are available since 1994 and before.

Bryna Seigel, Ph.D. from the Pervasive Developmental Disorders Clinic in San Francisco provides a 3-1/2 page report outlining the window of opportunity issue, program intensity, autistic specific training, parent training and similar elements. The assumption is that the window of opportunity for developing more adaptive means of communication starts to close and the child is left with a so-called "virtual disability", a lack of appropriate skill and knowledge secondary to a lack of experience and appropriate adaptive behavior. In my medical opinion, this has yet to be proven. What's missing is objective scientific literature on outcome studies.

Psychologist Dr. Dan produces a 23-page report with references. He performed a psychological assessment of Michelle on March 4, 1998 and became involved with her sister Natalie in June of `98. He was addressing the issues that there presumably educationally relevant interventions were available but they weren't receiving them. Therefore, the lack of these services caused harm for potential employment and quality of life; their future progress and adaptation have been irrevocably impaired by the lack of timely intervention.

Preliminary response to the questions:

The validation of any therapy or other intervention for autism requires assessment of symptom reduction in controlled clinical trials. The existing tools for autism assessment were primarily developed for the diagnosis of autism and are not optimally sensitive to assess changes in symptoms as a result of therapeutic interventions. Research observations need to be translated into clinical trials to develop the necessary methods to assess patient improvement as a result of therapeutic, dietary or behavioral interventions. The intensive behavioral treatment of autism as a proven, critical, determinant of outcome, as expounded upon by the Plaintiff's experts, needs to be examined in light of current evidence. There are proponents of these behavioral interventions as well as those who question the value of this type of intervention. In the March 1998 edition of Community Care, McCurry, in his article "All You Need is Lovaas", describes the pressure upon a total of 26 local authorities to adopt what he describes as a controversial and expensive treatment for autistic children despite questions raised about its efficacy in a government-commission study. He discusses the pro-Lovaas lobby, such as we see in this case, indicating that this technique has the best record of enabling young children with autism to lead a normal life. The

George Hom, Esq.
Re: Michelle and Natalie H. v. Paul LeMahieu
May 8, 2001
Page 3

concept of normal and recovery are never really well-defined in measurable terms. The dilemma in justifying huge payment for treatment that many regard as unproven when it might be better spent on other methods, is complicated by the fact that legal costs are consuming a great deal of resources as well. It's also considered significant that apparently unrealistic expectations of treatment produces dissatisfactions toward other interventions which are considered inadequate when compared to intensive behavioral intervention. A claim for intensive behavioral intervention is that there is a higher frequency of mainstream school placement among children treated this way but there's no direct data concerning long-term outcomes. Instead, there's a reliance on anecdotal evidence. Whether or not intensive behavioral intervention has led or not led to the inclusion of these children in mainstream schools is lacking clear, empirical data involving meaningful numbers of cases. McCurray quotes from his discussion with the National Autistic Society, which endorses early intervention but also promotes the close involvement of parents and notes the continuing problem that the technique may be appropriate for some children but not for others. As I've stated before, no single approach appears universally applicable because children with autism represent a marked range in terms of level and nature of needs and symptoms. The primary goal is still determining by what criteria one may match a given child with a given intervention to achieve maximal benefit. None of the so-called statistical epidemiologic or anecdotal descriptive studies effectively deal with the issue of the cases at hand.

There are a significant number of children who appear not to make improvements as a result of intense behavioral treatment. The question of how many hours need to be involved is discussed with the suggestion that the critical variable is intensity rather than methodology. Rita Jordan suggests that the intense behavioral approach can lead to dependence among the children concerned, thus limiting, rather than enhancing their access to normal day-to-day routines. In a book by S.Cohan, 1998, entitled "Targeting Autism" published by the University of California, Berkeley Press, it is once again restated that there is no standard treatment for autism and that the history of the so-called "breakthroughs" turn out not to be the great miracle originally thought, but helping only a small proportion of children with autism. The manifestation of the condition, autism, takes different shapes with different children and even within the same child at different ages. He recognizes that good results may be achieved due to the intensity of one-to-one work with very young children but this approach does not bring significant benefits for all children. The potential benefits and pitfalls of any strategy needs to be addressed to diminish the promised outcome which is the dream of all parents. The book also argues that most forms of treatment might best be described as facilitative. They bring about some improved functioning but do not eliminate the core features of autism. Treatments are many and various and may

George Hom, Esq.
Re: Michelle and Natalie H. v. Paul LeMahieu
May 8, 2001
Page 4

include auditory integration training, vitamin therapy, dietary treatment and so forth. All of these various and sundry therapies don't necessarily replace educational provision. There is no question about the value of early intervention. One year of intensive behavioral treatment during the preschool period can serve to narrow the gap in IQ and language skill between autistic and normally functioning peers.

Lovaas recommended 40 hours a week of intervention was necessary and that 10 hours were not sufficient to achieve benefits. A study by Anderson in 1987 tried to partially replicate this young autism project model and found that an average of 20 hours a week of one-to-one support over a year brought significant improvement in cognitive functioning in half the sample of children treated (Educational Treatment of Children, 10, pp. 352-366, Anderson, et al., 1987, Intensive Home-Based Early Intervention with Autistic Children).

The agreement seems to be that the young autistic child must be helped to respond to the environment, particularly to other people. The disagreement is how this is to be achieved. Some children can be jolted into attention by their teachers and others would withdraw or collapse altogether in the face of sharp intrusion into their autistic world. Some children will respond to the highly structured behavioral approach, which might be regarded as very intrusive, and other children need to be gently encouraged to interact, as is the case with the "Options/Sunrise" approach where the adult will initiate treatment by matching the child's action or joining in the child's activity. Evidence exists that the adult's imitation of the child's behavior is associated with greater social responsiveness in the child and the success of mutual imitation may be due to the intensity of the interaction where distractors are minimized rather than any particular strategy. Success seems to be predicated on children who have some understanding of speech and have begun to communicate. Therefore these results may not be relevant to severely impaired autistic children. In the original Lovaas study, children deemed to have poor outcomes were excluded. The target group comprised children under 40 months of age if they had speech and under 46 months if they did have some speech with an IQ cutoff. Forty-seven percent were said to have shown "recovery". This number included those children who didn't meet the criteria for age, speech and mental age, yet still had a good chance of achieving normal functioning. Also, the term recovery means something more than IQ on an average range and being placed in a mainstream educational setting. These may be the hallmarks of the applied behavioral approach but they don't bring about improvements in social behavior relationships. The Lovaas model emphasizes reactive behavior at the expense of spontaneous behavior or initiative. Actuarial success is not necessarily the same as real success. The complex neurological biological foundations of autism and the

George Hom, Esq.
Re: Michelle and Natalie H. v. Paul LeMahieu
May 8, 2001
Page 5

considerable individual differences among children with an appropriate diagnosis of autism, precludes the value of one-size-fits-all approach as suggested by many of the Plaintiff's experts. Ozonoff and Cathcart, 1998, in their article entitled, "The Effectiveness of a Home Program Intervention for Young Children with Autism" appearing in the *Journal of Autism and Development Disorders*, 28(1), 25-32, looked at the TEACCH model where the parents were advised about their children's particular assets and pre-vocational strengths and needs. They were then given demonstrations of teaching techniques such as they could continue the sessions begun by the therapists. After four months, the target group made nearly ten months of developmental gain which is particularly impressive since most children were diagnosed with full retardation as well. The teacher-based home program is beneficial in improving cognitive and developmental skills of young children. It also showed that it's possible to combine teaching methods and many of the children attended school programs using techniques different from TEACCH methods adopted at home.

Sheinkopf in 1998 in an article entitled "Home Based Behavioral Treatment for Young Children with Autism" in the *Journal of Autism and Developmental Disorders*, 28(1)15-23, found that behavioral intervention for young children with autism involved in only 27 hours a week and continuing for only slightly more than a year, brought about significantly higher cognitive functioning than the control group. They concluded that home-based behavioral treatment can be implemented successfully without the direct support of an academic center and the benefits gained with considerably less than the 40 hours a week of treatment intensity that has commonly been advocated for behavioral programs.

Lynch in 1998, (presented material in Autism 2(2), 180-197) made an argument for a less intrusive approach whereby the therapist worked towards change through accepting the child as he or she is and adopting a totally child-centered form of training which focuses on encouraging interaction. He cited evidence from a number of studies to demonstrate the success of methods with older children, the implication of benefits of combining a school program with a home-based program. This is in spite of the criticism that home-based treatment of children lacked the opportunity to mix with their peers and may become socially isolated. In a case report, they found non-aversive individual sessions of two to three hours to provide consistent and measurable progress in the imitation of spoken sounds, object identification and verbal naming of objects. The issue here is that the ABA repetitive and personal methods are not the only route to improvement.

It's hypothesized that the highly structured approach used in behavioral therapy is well-

George Hom, Esq.
Re: Michelle and Natalie H. v. Paul LeMahieu
May 8, 2001
Page 6

matched to the concrete, one-track thinking typical of a child with autism. Some changes may relate to spontaneous development and it was concluded that 40 hours per week of intensive therapy advocated by Lovaas is not necessarily required for improvements to occur. In a report by Selv, 1998, entitled "The Lovaas method", E.P.S.: Hereford, Herefordshire Council, Sheinkopf s.2000 Lovaas Programs emphasizes the problems using the term "recovery" by Lovaas with normal functioning in a subsequent publication. He doesn't address the problem of why these techniques have not been taken over wholesale in specialist schools if there's such a high probability of positive outcomes. Objective research analysis of these methods have been replaced by litigation. Non-random allocation of subjects to experimental/control groups, differences in ages between experimental and control group, questionable validity of intelligence testing among such very young children, the validity of cognitive measures is all the more uncertain when it's noted that different tests may have been used at initial and follow-up assessment.

Outcome Parameters: In a 1993 chapter by Smith in *The Handbook of Effective Psychotherapy* put out by Plenum Press and edited by Giles, a number of studies were reviewed to highlight what the factors might be that influence autism treatment effectiveness. All the studies that indicated preschool younger subjects having better outcome were not adequately controlled for the possibility that the younger and older children were dissimilar in other respects from the outset, so that the outcomes may reflect pre-existing differences rather than unequal responses to treatment. There's also a problem where the treatment situation is different from the situation in which they are expected to use the skills. He concludes the behavioral treatment has achieved its popular position by default and not by being compared with and surpassing alternative interventions. Other interventional approaches may be equally effective but also do not have clear experimental support. Once again, the need to have the Lovaas work replicated objectively has yet to be accomplished.

Schopler, 1998, in "Ask the Editor" appearing in the *Journal of Autism and Developmental Disorders*, 28 (1) '91-'92 addresses the issue of why one may not wish to support the Lovaas technique as a general policy. The end result, research issues, and the concern that courts are being used not simply to resolve legitimate procedural questions but increasingly judge research questions, which actually can only be resolved through further experimentation and observation. The coercive legal action against education authority used in an effort to implement techniques that should be tested in replication research first, is a serious therapeutic dilemma.

Irrespective of the techniques involved, the assessment by professionals regarding

George Hom, Esq.
Re: Michelle and Natalie H. v. Paul LeMahieu
May 8, 2001
Page 7

progress needs an agreed-upon battery which would provide the efficiency of producing criteria for the initial allocation of children among various interventions available. This requires some level of coordination and informed choice. If people are not allowed to look at a range of services, then the emphasis to press for an intensive behavioral approach, which may or may not be appropriate for a particular child, by legal coercion, would be detrimental to the well being of various cases.

There are projects going on as suggested by research that the Lovaas group makes good initial progress, even though this may be due to learning appropriate test behaviors. The question of long-term progress over and above what might be considered expected with other approaches and the decrement when the level of support is diminished is still an open question.

As stated previously, most of the evaluative work on the Lovaas programs have been done by individuals who are themselves committed to this approach. There are few comparative studies. This does not mean that there are good evaluative studies of other programs of less intensity or school-based approaches. Even Lovaas and his colleagues have produced data to indicate that a significant percentage of children do not benefit greatly from the intensive behavioral approach but they haven't been able to determine which children will profit best and which will not. Lovaas has been said to suggest that the critical factor may be the level of progress within the first three or four months of the program, particularly language.

The two studies that are in progress to examine the effectiveness of intensive behavioral intervention for children with autism include one by Howlin and Gould at St. George's Hospital and will report in 2003. They have two groups of preschool children. One group is following home-based behavioral and the other is attending nursery provision. The second study by Mudford at Keele University is looking at progress in outcomes for United Kingdom children receiving in-home and parent-managed behavioral programs versus the Lovaas 1987 results. In personal correspondence from the SARC Autism Center, May 8, 2001, they reported to me that the 50 percent recovery rate done by UCLA have not been duplicated where the programs are being run by parents without the professional support of UCLA personnel and where the quality and intensity of therapy was questionable. They also report that the window of opportunity is actually much wider than some clinicians believe and anecdotally, there are a wide variety of reports indicating programs starting at the age of 5 where children have been verbal and functional. In any event, there is no question that the partisan advocacy and ad hominem criticism of the State as manifested by these reports represent a limited perspective and needs to be scrutinized in light of objective

George Hom, Esq.
Re: Michelle and Natalie H. v. Paul LeMahieu
May 8, 2001
Page 8

research and understanding of a condition that has multidetermined and multi-factorial etiologies and outcomes.

To accept the ad hominem damning commentary by Plaintiff's experts in a clear adversarial proceeding puts the court in the position of having to render a more objective decision as to what might be in the best interest of the child rather than following a strict doctrinaire approach to redress procedural issues.

Sincerely yours,

Robert C. Marvit, M.D.

RCM:mk

cme2q01horsley.47