# Hall Associates

Rehabilitation Consultants
7290 Navajo Road. #105
San Diego, CA 92119
Office (619) 463-9334
Fax (619) 463-9337
info@rehabsource.org

**8/26/08**

<u>**Expert Witness Reports of Robert B. Hall, Ph.D., CRC, CDMS**</u>

<u>**Case Names:**</u>

*Mark H. et al. v. Paul LeMahieu., et al. Civil No.: CV 00-00282 MLR;*

*Stephen L., et al. v. LeMahieu., et al. Civil No.: CV00-00338 MLR*

Per Federal Rule 26 requirements, please find attached my reports and exhibits for Aaron L. and Michelle and Natalie H.

Respectfully,

Robert Hall, Ph.D., CRC, CDMS

<u>Attachments:</u>

Exhibit I – Expert Curriculum Vitae

Exhibit II – Fee Schedule

Exhibit III – List of Expert Testimony Cases

Exhibit IV – Literature Review

# Hall Associates

Rehabilitation Consultants
7290 Navajo Road. #105
San Diego, CA 92119
Office (619) 463-9334
Fax (619) 463-9337
info@rehabsource.org

8/26/08

### EXPERT WITNESS REPORT OF ROBERT B. HALL, PH.D., CRC, CDMS

**Re: Natalie H.**
**Case Name:** *Mark H. et al. v. Paul LeMahieu et al. Civil No.: CV 00-00282 MLR;*

## A.    Qualifications

Dr. Robert Hall has worked as a <u>Vocational Rehabilitation Consultant</u> since 1973. His full C.V. is attached as Exhibit I. He has experience providing evaluation and consulting services with disabled adults and youth in a variety of rehabilitation and disability compensation settings, including workers' compensation, long-term disability, and Social Security.   Company-wide, over 2,500 persons have been served since 1978. Expert witness services are provided in variety of legal settings, including personal injury, medical malpractice, employment law, and spousal support. Employer and organizational consulting has been provided, including the design & evaluation of assessment, re-employment and disability management programs. Case management and rehabilitation planning services provided with a wide variety of individuals with an emphasis on those having significant work disability.

## B.    Authorship

The list of Dr. Hall's publications is included in the attached Curriculum Vitae in Exhibit I.

## C.    Compensation

All services provided in preparation of this report were billed at $300/hour. A fee schedule is attached in Exhibit II

## D.    Prior Expert Witness Services

Exhibit III contains the list of all cases testified on within the past four years.

## E.    Work Performed to Date:

### 1.  Records Reviewed:

| |
|---|
| Reports of Dr. Daniel LeGoff, 1/01, 7/03, 4/04 |
| VR Report (Rehabilitationist & LCP) Carol Forsloff, 7/03 |
| LCP by Loretta Lukens Updated, 7/03 |
| Special Ed Consult – Joan Hawkins |
| Report of Dr. Robert Marvit, 5/8/01 |
| Reports by Dr. Jay Lucker, 7/03, 9/03 |
| LCP Loretta Lukens, 6/2/08 |
| Deposition of Loretta Lukens, 6/8/08 |
| Dr. Dan (48 min) |
| Natalie and Michelle at Home (25 min) |
| Mark H. (40 min) |
| Childhood Autism rating scale – no date |
| Psych Evaluation 9/6/94 (Natalie) |
| Leeward Dx Unit Conference Summary 9/21/94 (Natalie) |
| Psych Eval 5/22/95 (Natalie) |
| Deposition of Robert Eugene 4/24/01 |
| Deposition of Paula Marayama 7/24/01 |
| Deposition of Nadine Chun 7/24/01 |
| Deposition of Gloria Kishi 4/28/04 |
| Deposition of Joanne Germon 5/21/04 |
| Deposition of Carey Akamine 6/25/04 |
| Deposition of Louise Funaski 7/2/04 |
| Deposition of Jenny Wells 7/1/04 |
| Elementary Cumulative Record Form (K-6) St. of HW (Natalie) |
| IEP (Natalie) 96, 98, 95, 00, 01 + case conference summary |
| Dr. LeGoff (Natalie and Michelle) Support letter 2/28/00, Mental Health update 11/18/01 |
| Deposition of Rie H. 1/26/00 |
| Deposition of Mark H. Volume I, II & III 6/14/03, 6/7/03, 1/26/01 |
| DOE hearing 1/14/00 Volume I |
| Letter from Dr. Siegel 3/29/01 |
| Special Ed. Consultation, Ms. Hawkinson 4/23/04 |
| Preliminary Report, Dr. Goka |
| Supplemental Report, Dr. Goka 7/31/01 |
| Rebuttal Report, Beverly James 5/19/04 |
| Legal Consultant in Special Ed 1/29/01 Barbara Bateman |
| Deposition of Barbara Bateman 1/14/01 |
| Dr. Dan #1 (34 min)>48 |
| Dr. Dan #2 (14 min) |
| Deposition of Daniel LeGoff, 7/8/08 + Exhibits |
| Deposition of Dr. Jay Lucker, 7/10/08 + Exhibits |
| Telephone Conference with Dr. Sheinkoph, 8/21/08 |

Due to the voluminous number of records reviewed, I summarize below those documents I considered most pertinent to my opinions on this case:

A. <u>Deposition of Nadine Chun, 7/24/01</u> –
   - Ms. Chun worked as a student services coordinator at Kalihi Elementary School and has worked with both Natalie and her sister.
   - Ms. Chun stated that she designed her classroom in the TEACH model and had training in autism along with previous experience having autistic children in her classroom.
   - Ms. Chun said that during the time Natalie spent in her classroom, she had many psychosocial issues including issues with insufficient hygiene practices.
   - Ms. Chun opinioned that she had also tried to communicate issues to Natalie's parents, but many times she felt that they neglected them, including sending homework with Natalie never to be returned.

B. <u>Hearing of Mark H. vs. Hawaii Department of Education, 1/14/00</u> -
   - Issues discussed included: 1) IEPs not addressing unique needs, 2) Lack of appropriate educational and related services under the DOH/DOE, 3) Denial of services to Natalie & Michelle H. claiming that they did not qualify due to insurance, 4) Insufficient related services, 5) Lack of coordination of services, 6) Lack of intersession services until 1998, 7) Current IEPs not being followed, 8) Lack of properly training teachers, 9) Procedural errors in development of IEPs, 10) Agreed services never being provided or being delayed, 11) Lack of appropriate respite services, 12) Discrimination based on Natalie's disability; violation of section 504.
   - In the 0-3 program, Natalie was limited to 1-2 days per week of services, her sign language teacher was never replaced after she moved, and Dr. Koven never followed up on his services.

C. <u>Special Education Consultation (in-service), Ms. Hawkinson, 4/23/04</u> –
   - In regards to Autism, Ms. Hawkinson states that these children tend to reach a threshold of growth. In her opinion, no two children with autism are alike and it's too difficult to compare or have an expectation for their development.
   - Overall, there has yet to be any research that demonstrates a methodology that consistently can be expected to treat the condition with a high degree of predictability.
   - Ms. Hawkinson stated that benefits of appropriate instruction are not time sensitive to the degree that appropriate instruction is no longer a benefit or doesn't impact the child in a positive way; there is no evidence that supports that future development is limited due to not receiving a particular method of treatment in a set timeframe. While plasticity declines in adulthood, it still continues.
   - In regards to Individualized Educational Plans (IEPs), Ms. Hawkinson said that there are no universal standards but instead reasonably expected models and Natalie was unlikely harmed by inadequate wording.

D. <u>Rebuttal Report (to Ms. Hawkinson's 4/23/04 Report), Beverly James, 5/19/04</u> –
- Ms. James stated that Natalie H. was denied autistic specific services from 1994-1998 and was ultimately harmed by the actions or inactions taken by the DOE.
- She said that Mr. and Mrs. H. have symptoms consistent with Major Depressive Disorder and PTSD which conflicts with Dr. Briskin's Report in which he diagnoses them with Adjustment Disorder with Mixed Anxiety and Depressed Mood.
- Ms. James disagrees with three major topics addressed in Ms. Hawkinson's Report including 1) Autism Specific Methodologies, 2) Early Intervention, and 3) Procedural Errors in IEPs.
- Ms. James stated that there is not a question of effectiveness of the services provided but instead there is a question of why there were no services provided at all.
- Ms. James said that early intervention is mandated by law and is supported by the basic principals of human brain development and learning.
- In regards to procedural errors, Ms. James stated that Ms. Hawkinson failed to recognize an IEP as a critical educational, clinical and legal process.

E. <u>Legal Consultation in Special Education Report, Barbara Bateman, 1/29/01</u> –
- There was a five year delay in services for Natalie.
- Listed inadequacies in the DOE's offerings include: 1) failures to thoroughly inform parents of their rights and their daughter's entitlements under IDEA, 2) failure to provide adequate and thorough diagnostic evaluations, 3) failure to provide early, intensive programs utilizing autistic techniques, 4) failure to provide qualified teachers, 5) failure to provide appropriate behavior plans, and 6) failure to provide necessary parent training.
- Other inadequacies addressed that are specific to Natalie include IEPs that stated limited time spent in OT and speech therapy, and a lack of responsibility of the DOE to pursue services by instead placing it on the parents.

F. <u>Rehabilitationist Report, Carol Forsloff, 7/11/03</u> –
- Ms. Forsloff stated that appropriate jobs for people who are autistic would be something that "does not require high demands on short term memory or any complex sequencing by verbal commands".
- Examples of such jobs include assembly work, running photo copies, watering and caring for plants, cleaning and cooking, landscaping, mowing lawns, sorting type jobs (recycling), janitorial jobs and data entry.
- She added that it is important to take into account that Dr. LeGoff said that Natalie has no capacity for interpersonal relationships.

G. <u>Life Care Plan, Loretta Luken, 7/16/03</u> –
- Natalie's diagnoses include: Axis I: Autism with severe language and communication delays, Axis II: MMR, Axis III: S/R idiopathic thrombocytopenia, Axis IV: social, language adaptive and academic deficients as well as significant family distress, Axis V: GAF = 50. She is dependent in all ADLs.

- Per her teacher's report in January of 2001, Natalie's strengths include working on tasks independently for 30 minutes, learning new tasks quickly when using a model to follow, a strong sense of pattern and rhythm (per her love of music and singing), matching pictures to words, copying sentences, and cutting shapes.
- Areas that Natalie needs further development in include her tendency to get easily frustrated, her resistance from change, her lack of motivation, being distracted by external and internal stimuli, her compulsive negative psychosocial behaviors, and her medical issues including her vision.
- Annualized Totals of the LCP: Age 10-21 $123,413 and Age 22-lifespan $145,297.

H. Special Education Consultation, Joan Hawkinson –
- Ms. Hawkinson concluded that while a structured behavioral program is regarded as effective, there is no cure for autism. Also, Natalie's development was not stopped just because a particular strategy was not employed during her pre-school years.

I. Neurodevelopmental Re-Evaluation, Dr. LeGoff, 6/6/08 –
- Natalie is now almost 16 years old.
- Natalie's typical school day includes half a day of vocational training such as sorting and packaging, lei making, cracking nuts, car detailing and basic gardening.
- Natalie had picked up interactive computer games, basic word processing and piano lessons.
- Vineland assessment shows minimal or no improvement since 2004 with the exception of some improvement in ADLs. The most problematic areas are socialization and communication, in which Natalie has actually regressed or showed no progress
- Compared to a previous assessment, Natalie had been showing increasing problem behaviors including aggressive, disruptive and stereotypical behaviors. Natalie could benefit from related behavioral services.
- Natalie's diagnoses are as follows: Axis I: Autistic Disorder, Axis II: Mental Retardation, Axis IV: Communication, social and adaptive, Axis V: GAF = 25.
- In conclusion, Dr. LeGoff stated that Natalie continues to exhibit significant features of autistic disorder at a moderate level of severity with a severe impairment of communication abilities. Dr. LeGoff stated that with the lack of services provided, Natalie's poor outcome was "sadly predictable". Natalie's only significant improvement has been at home where she does not receive any services. Further services are needed which address improving Natalie's adaptive coping skills, and adaptive social, communication and self regulatory skills.

J. Telephone Conference with Dr. Sheinkoph, 8/21/08 –
- While Natalie has some areas of relative strength (block design), she is still very delayed in comparison to her similar aged peers.
- Natalie's Full Scale IQ score is 44, which is significantly lower then her Non-Verbal IQ score of 59. However, overall she has a scaled level 2 score on the

Non-Verbal Matrices assessment, still well below average as compared to her peers.

- Dr. Sheinkoph opined that Natalie H. is not competitively employable and sheltered work or supported employment is a possibility for her future.

## 2. School Visit:

On 6/4/08, I attended Roosevelt High School in Honolulu, HW. Activities consisted of meetings with Natalie's transition teacher (Steven Pepe), Natalie's autism resource specialist (Alida Gandy), Natalie's teacher (Mark Heu), and Natalie's one-on-one support (Marissa Noury). I also observed Natalie in her classroom and adaptive PE class and interviewed Natalie's mother, Rie H. with the assistance of an interpreter.

In observing Natalie in classroom and PE activities, the following was noted:

- Natalie is able to communicate to a limited degree. She can converse and answer questions on a limited basis.
- She needs a lot of prompting to stay on task.
- She is very cooperative working with her aide and teachers.
- She is very animated and childlike in her verbalizations and excites easily.
- She can write slowly and erase.
- She is very limited in her ability to read, placing material 6" from her face.
- She can read a clock and state the correct time.
- She appears to fatigue easily and her affect will change when tiring.
- In her PE class, Natalie was quite animated and enjoyed the activities, and was largely able to follow the teacher's cues re: lower and upper extremity physical movements.

In my interview with Rie. H., Natalie's mother, she reported the following information:

- She is a HS graduate in Tokyo, she has no college. She has worked in the past as a teller and in clerical jobs. She does not work @ present.
- Natalie's Father is a HS grad and thinks he finished some kind of degree (she thinks Business) at the University of Phoenix.
- He has worked that past 4-5 years in private security, working for individuals. He drives for them and accompanies them on travel. Previously, he worked in tourism related sales.
- She stated that Natalie is not independent in many areas, but largely takes care of herself, except for bathing.
- Natalie is more capable than Michelle, more "chirpy", she catches on faster, she speaks more, she is more proactive.
- She is still excitable, socially inappropriate, speaks too loudly.
- She will get agitated, start yelling. She has improved with behaviors, but overstimulation will trigger outburst.
- She states Natalie was on SSI, but their income exceeded limits. She thinks she can get back on at age 18.
- She expressed surprised when told her daughters could be in school until age 20. She thought it was age 22.
- She is unaware of DVR services. She has contacted Dept of health/DD services, but "it hasn't done anything".

Natalie H. – Vocational Rehabilitation Report of Robert Hall, Ph.D., CRC, CDMS                          7

- She stated work goals for both daughters are the same, nursery work, light production/assembly work, etc. She feels Natalie has a talent or "gift" for music.
- She feels only options were for daughters to live with her, live independently, or be in an institution. She was unaware of any group living options.
- She questioned what type of employment someone with autism could do?

In my interviews with Natalie's teachers and other staff, the following information was obtained:

- Natalie attends the Occupational Skills Center, 4 days/week.
- Her tested interests were in horticulture and animal care.
- So far, she has participated in light assembly and plant nursery activities.
- School transition activities are focusing on life skills ADLs.
- It is expected that she will stay at this school thru graduating with her class at age 18, but she could stay until age 20.
- Per discussion with her teachers and staff, it was learned that primary focus areas for Natalie include communication and interpersonal skills, life and independence skills; including cooking, cleaning, etc., preparing for when they might live in a group living situation.
- In addition, she is being exposed to occupational skills, having already participated in some light assembly and nursery-type work.
- She works with 5-10 other students. Almost all require 1:1 supervision.
- She likes nursery work. This is more demanding than the light manufacturing work, which was more structured. She works well independently, watering plants & weeding.
- Her activities have been at the two bottom levels of occupational skill options, the highest being carpentry and automotive.
- Natalie's level of disability is "moderate" (rated 4/10) as compared to other special ed students @ Roosevelt. She has a combination of impairments, social, communication, and cognitive.
- She continues to improve, she enjoys learning. A 1:1 process is still needed for her, and she needs this to progress.
- Natalie less aggressive now. She used to have weekly tantrums. Now she calms down much faster.
- She works more independently. In 45' activity, she requires 5-10 prompts to stay on task. She needs prompting to initiate.
- Most social engagement is still non-verbal, but is communicating more.
- Trying to encourage Natalie to be more self-initiating, using fewer prompts.
- Working on life skills, i.e. shopping lists, filling out applications, money management.
- This occupational focus will increase in her senior year, transitioning to Department of Vocational Rehabilitation or DD services, depending upon their decision as to her ability to benefit from services.
- Winters @ Work and Abilities Unlimited are sheltered workshop options.
- Other options include Goodwill and Easter Seals programs. There is also a supported employment program through the Oahu Special education Center (SECO). All of these are available as transition options, which is part of her IEP.
- Her teachers do not believe Natalie will ever be competitively employed.

## Background Summary
Date of Birth: 8/3⬛. Natalie is 16 years old.

Living Situation: Natalie lives at home with her parents and other sibling, Michelle.

## Education History
Education: Natalie was first placed in a 0-3 program in 1994. Our records show that she moved schools many times, starting in 1995 & 1996 at Kipapa Elementary School, moving to Hokulani Elementary School from 1997-1999, moving to Ali'iolani Elementary School in 1999 and 2000. She later attended Ka'ilulani School from 2000-2003. Natalie currently attends Roosevelt High School in Honolulu, HI, attending her 2nd year there. She is in the 9th grade.

## Occupational Analysis
To determine possible future employment options for Natalie, a preliminary Occupational Analysis was conducted using Software for Education, Employment, & Rehabilitation (SEER 2.0, 2005). SEER utilizes the United States Department of Labor's O*NET database and Standard Occupational Classification (SOC). O*NET identifies 120 SOCs that, based on their occupational information, are broken out into more detailed O*NET occupations.

Typically, the occupations of a child's parents can be used to estimate a child's pre-morbid vocational capacity. Given the issues on this case and Natalie's various disabilities, this would have been inappropriate. Instead, we completed an occupational analysis which utilized Natalie's test scores in different ability areas. Natalie has very low abilities in reasoning, communication, and language. We were able to compile a limited list of possible compatible jobs for a person who has very low abilities and require little or no preparation. These results included these occupations:

> Sewing Machine Operators, Garment, SOC 51-6051
> Graders and Sorters, Agricultural Products, SOC 45-2041
> Dishwashers, SOC 35-9021
> Food Preparation Workers, SOC 35-2021
> Helper – Production Workers, SOC 51-9198

## Disability & Employment Research
A literature review (Exhibit IV) was conducted to obtain baseline information with regard to typical outcomes for persons more significant and work limiting disabilities, in particular persons with autism and mental retardation. Both Federal and State data resources were utilized, including the largest, most reliable federal surveys of disability prevalence and status, employment, and earnings.

Natalie has multiple impairments as a result of her autism and mental retardation. In our attached literature review we discuss common difficulties people with mental retardation and autism face in the world of work some of which include difficulty communicating, limited social skills, unusual behaviors, and reliance on routinized work activities. Autistic persons, especially those with fewer functional limitations and higher

IQ do have more employment potential, but there is little data available, especially longitudinal employment data. Those autistic persons with other work limiting impairments and lower IQ have lower employment rates and greater work retention problems.

Competitive employment is typically not possible. However, with respect to autism alone, some research[1] shows that people with these impairments can benefit from supported employment programs and sheltered work opportunities. Integrated community employment strategies offer some advantages over sheltered employment, but most persons with significant mental retardation who maintain employment do so in sheltered employment. Intensive job coaching and supervision as part of a supported employment program can improve outcomes somewhat, they are difficult to maintain over time.

Examples of typical sheltered employment work opportunities for people with autism range from data input or assembly work to gardening. While few autistic children grow to be fully self-supporting, work opportunity of a limited type and nature is typically feasible, but tends to be sporadic, part-time, and provides little actual income.

In summary, although some progress has been made in understanding which services lead to improved employment and earnings outcomes, most persons with significant and more severe disabilities do not work competitively and earn little income. In all cases, the probability of persons with this level of disability working competitively and maintaining an employment role over their life span is well below 50%. Work tends to be sporadic, part-time, and produces little income. Most persons receive federal disability benefits (SSI) and maintain those over their lifespan.

## F.    Discussion and Opinions

Note: At this time, my opinions are based upon the information reviewed to date and the results of our vocational evaluation, thus these opinions are subject to change and/or modification should further information become available.

## Employability
Persons with Natalie's type and level of impairment (Autism/MR) typically do not work competitively. The range of employment outcomes for persons with Natalie's impairments are represented by sheltered work or supported employment (long-term) with individualized supervision or in a group enclave which is also heavily supervised.

Natalie will likely stay on SSI and any earnings she has from employment would be negligible. The value of employment activity for her will largely be with respect to quality of life and socialization, not economic. Given the severity of her disabilities and functional limitations, I believe to a reasonable degree of vocational probability this would have likely

---

[1] Inge, K. (2007). Supporting individuals with autism in integrated community jobs: identifying support needs to facilitate success. CRP-RCEP, Virginia Commonwealth University. Ross, D., Garcia-Villamisar, D. & Wehman, P. (2000). Clinical differential analysis of persons with autism in a work setting: a follow-up study. *Journal of Vocational Rehabilitation 14*, 183-185

been the case, independent of what educational services might have been provided her in the past.

## Recommended Vocational Rehabilitation Services

The following provides my recommendations for vocational rehabilitation services for Natalie from this date forward. As a basis for these recommendations, the following was considered:

Natalie has been diagnosed with autism and mental retardation. She is 16 years old, is in the moderate to severe range of impairment for her level of autism and mild to moderate range of mental retardation. Natalie has expressive language deficits which impact her abilities for social and communicative function.    Goals for Natalie include increased opportunities to allow for social interaction and increase their independent living skills. Research was conducted to evaluate the available services for Natalie to meet these goals. The service agencies which are available in her local area are listed below:

1) Hawaii Vocational Rehabilitation and Services for the Blind – the vocational and rehabilitation services for the blind is a state-federal program that provides services to help people with physical or mental impairments to attain successful employment outcomes.    This service provides an assessment of the individual resources, abilities and interest, case management and development of an Independent Plan for Employment.  There are six local offices in Hawaii.  Ability to benefit from these services would be determined during eligibility screening.

2) Puna Kamali'i Flowers, Inc. – this agency is one of the leading employers of individuals with disabilities in Hawaii.    They provide supported employment placement with a job coach who will be trained to assist the individual on a job and continue as long as they need assistance.  Their webpage states, "you do not need to have many skills already, nor do you need to know how to read, write or even speak."

3) The Hawaii Department of Health – Developmental Disabilities Division – this agency provides case management and information services to people with development disabilities and/or mental retardation.  They also provide information on adult day health, transportation and supported employment services.

4) Goodwill Industries of Hawaii – a private non-profit corporation that provides job training and employment service programs for people with various barriers to employment.  Good will industries will individualize the training to each individual's goals.    Goodwill can provide training in a specific career field, provide an opportunity to intern or practice work skills, assist in increasing physical stamina for work and help to improve job seeking skills.

5) Kapiolani Counseling Center – to assist Michelle, Natalie and their family in dealing with their continued impairments, this agency will provide therapy services for individuals and their families experiencing emotional/behavioral problems.

6) The Hawaii Disability Rights Center - is a protection and advocacy system for the residents of Hawaii who are living with disabilities.  This service engages in outreach to under-served populations, provision of information by providing referrals to other resources, education and training activities for people with disabilities and

others involved in their life, and individual casework by way of technical assistance, self advocacy, and short term assistance.

For purposes primarily of quality of life and community involvement, not competitive employment, some vocational rehabilitation services maybe beneficial.  The following long-term services would likely be required to facilitate Ms. H.'s possible pursuit of employment:

>Vocational Rehabilitation Services:
>1. Supported Employment Services (1:1 or group enclave with supervision)
>2. Vocational Skills Training
>3. Case Management

Job placement and employment retention support services would be of particular benefit to Natalie, once she reaches an appropriate age, expected to be after age 20. She will be able to receive these services without cost from one or more of the above agencies. Case management and coordination of services is also needed and should be available from the Hawaii Department of Health.

Given her level of disability, I believe that to a reasonable degree or vocational probability these services would have been required for her, independent of what educational services she may have been able to obtain in the past.

### Rebuttal to Carol Forsloff's Report, 7/11/03 –

*"It is impossible to predict what either girl may have achieved had appropriate, early educational and therapeutic intervention been provided and the parents given important guidance and counseling. On the other hand, literature indicates that many autistics were able to work productively in a variety of occupations and that early intervention is very important in providing the best possible opportunity for vocational success."*

While Ms. Forsloff recognizes that it is impossible to predict what achievement levels Natalie might have achieved with additional services, she overstates the evidence of employment success for persons with Natalie's type and severity of impairment. Because Natalie also has significant mental retardation, the literature that focuses just on autism would be inappropriate to rely upon. As described in our attached literature review, disability statistics indicate very low labor force participation rates for people with Natalie's level of combined impairments of severe autism and mental retardation.

*"These girls (Natalie and Michelle H.) did not receive early, consistent intervention by trained specialists and therefore their vocational futures have been severely compromised."*

*"The fact that neither Natalie nor Michelle were provided with this intervention (early) has likely made a substantial difference in their present and future achievement."*

*"It is also entirely possible that because they did not receive important early intervention that they will never be able to work and therefore have lost a lifetime of potential earnings and require dependent care for the foreseeable future."*

Natalie H. – Vocational Rehabilitation Report of Robert Hall, Ph.D., CRC, CDMS                    12

Ms. Forsloff stated that Natalie would have achieved more but for the alleged lack of services. These opinions are beyond the scope of Ms. Forsloff's training and expertise and she fails to take into account the opinions of other qualified experts who disagree that the alleged lack of services have had this permanent, negative impact on Natalie's and Michelle's development.

Overall, Ms. Forsloff's estimate of Natalie's potential occupational attainment is unsupported by facts and inconsistent with employment and earnings data for persons with her type and severity of impairment.

I defer to other experts Ms. Forsloff's recommended services for communication and social services training, medical management, behavioral psychology, and counseling and respite care for Natalie's parents.

As discussed above, I agree with Ms. Forsloff's recommendations for case management and pre-vocational training and situation assessments. I do feel these services are available at no cost to her in the local community and that she would have likely required these same services with or without any special need created by the alleged lack of early intervention or services.

This completes my report. Please contact me at 619-463-9334 should you have any questions.


Respectfully,

Robert Hall, Ph.D., CRC, CDMS

**Hall Associates**

Rehabilitation Consultants
7290 Navajo Road. #105
San Diego, CA 92119
Office (619) 463–9334
Fax (619) 463–9337
info@rehabsource.org

**8/26/08**

**EXPERT WITNESS REPORT OF ROBERT B. HALL, PH.D., CRC, CDMS**

**Re: Michelle H.**
**Case Name: *Mark H. et al. v. Paul LeMahieu. et al. Civil No.: CV 00-00282 MLR;***

**A.    Qualifications**

Dr. Robert Hall has worked as a <u>Vocational Rehabilitation Consultant</u> since 1973. His full C.V. is attached as Exhibit I. He has experience providing evaluation and consulting services with disabled adults and youth in a variety of rehabilitation and disability compensation settings, including workers' compensation, long-term disability, and Social Security.   Company-wide, over 2,500 persons have been served since 1978. Expert witness services are provided in variety of legal settings, including personal injury, medical malpractice, employment law, and spousal support. Employer and organizational consulting has been provided, including the design & evaluation of assessment, re-employment and disability management programs. Case management and rehabilitation planning services provided with a wide variety of individuals with an emphasis on those having significant work disability.

**B.    Authorship**

The list of Dr. Hall's publications is included in the attached Curriculum Vitae in Exhibit I.

**C.    Compensation**

All services provided in preparation of this report were billed at $300/hour. A fee schedule is attached in Exhibit II

**D.    Prior Expert Witness Services**

Exhibit III contains the list of all cases testified on within the past four years.

## E.    Work Performed to Date:

### 1. Records Reviewed:

| |
|---|
| Reports of Dr. Daniel LeGoff, 1/01, 7/03, 4/04 |
| VR Report (Rehabilitationist & LCP) Carol Forsloff, 7/03 |
| LCP by Loretta Lukens Updated, 7/03 |
| Special Ed Consult – Joan Hawkins |
| Report of Dr. Robert Marvit, 5/8/01 |
| Reports by Dr. Jay Lucker, 7/03, 9/03 |
| LCP Loretta Lukens, 6/2/08 |
| Deposition of Loretta Lukens, 6/8/08 |
| Dr. Dan (48 min) |
| Michelle and Natalie H. Home (25 min) |
| Mark H. (40 min) |
| Case Conference Summary 5/5/94 (Michelle) |
| Social Work Report 4/6/94 (Michelle) |
| Psychological Evaluation 4/20/94 (Michelle) |
| Academic Evaluation 4/14/94 (Michelle) |
| Speech and Lang Evaluation 4/9/04 (Michelle) |
| IEP 7/11/94 (Michelle) |
| Case Conference Summary 4/3/97 (Michelle) |
| Educational Evaluation 2/25/97 (Michelle) |
| Speech/ Lang Evaluation 3/12/97 (Michelle) |
| Intellectual Evaluation 3/12/97 (Michelle) |
| Social Work report 2/11/97 (Michelle) |
| Childhood Autism rating scale – no date |
| Multidisciplinary Assessment  11/17/99 (Michelle) |
| Case Conference Summary 12/8/99 (Michelle) |
| Letter from Margaret Koven 5/3/94 (Michelle) |
| Deposition of Robert Eugene 4/24/01 |
| Deposition of Paula Marayama 7/24/01 |
| Deposition of Nadine Chun 7/24/01 |
| Deposition of Gloria Kishi 4/28/04 |
| Deposition of Joanne Germon 5/21/04 |
| Deposition of Carey Akamine 6/25/04 |
| Deposition of Louise Funaski 7/2/04 |
| Deposition of Jenny Wells 7/1/04 |
| Dr. LeGoff (Natalie and Michelle) Support letter 2/28/00, Mental Health update 11/18/01 |
| Deposition of Rie H. 1/26/00 |
| Deposition of Mark H. Volume I, II & III 6/14/03, 6/7/03, 1/26/01 |
| DOE hearing 1/14/00 Volume I |
| Letter from Dr. Siegel 3/29/01 |
| Special Ed. Consultation, Ms. Hawkinson 4/23/07 |
| Preliminary Report, Dr. Goka |
| Supplemental Report, Dr. Goka 7/31/01 |

Michelle H. – Vocational Rehabilitation Report of Robert Hall, Ph.D., CRC, CDMS                3

| Rebuttal Report, Beverly James 5/19/04 |
|---|
| Legal Consultant in Special Ed 1/29/01 Barbara Bateman |
| Deposition of Barbara Bateman 1/14/01 |
| Dr. Dan #1 (34 min)>48 |
| Dr. Dan #2 (14 min) |
| Deposition of Daniel LeGoff, 7/8/08 + Exhibits |
| Deposition of Dr. Jay Lucker, 7/10/08 + Exhibits |
| Telephone Conference with Dr. Sheinkoph, 8/21/08 |

Due to the large amount of records reviewed, I will summarize what I see as the most pertinent information.

A. Deposition of Nadine Chun, 7/24/01 –
   ▪ Ms. Chun worked as a student services coordinator at Kalihi Elementary School and has worked with both Michelle and her sister.
   ▪ Ms. Chun stated that she designed her classroom in the TEACH model and had training in autism along with previous experience having autistic children in her classroom.
   ▪ Ms. Chun said that during the time Michelle spent in her classroom, she had many psychosocial issues including issues with insufficient hygiene practices.
   ▪ Ms. Chun opinioned that she had also tried to communicate issues to Michelle's parents, but many times she felt that they neglected them, including sending homework with Michelle never to be returned.

B. Hearing of Mark H. vs. Hawaii Department of Education, 1/14/00 –
   ▪ Issues discussed included: 1) IEPs not addressing unique needs, 2) Lack of appropriate educational and related services under the DOH/DOE, 3) Denial of services to Michelle and Natalie claiming that they did not qualify due to insurance, 4) Insufficient related services, 5) Lack of coordination of services, 6) Lack of intersession services until 1998, 7) Current IEPs not being followed, 8) Lack of properly training teachers, 9) Procedural errors in development of IEPs, 10) Agreed services never being provided or being delayed, 11) Lack of appropriate respite services, 12) Discrimination based on Natalie's disability; violation of section 504.
   ▪ Specific to Michelle, her IEPs were not followed and in 94-95 school year services were delayed because paperwork had been lost. Also, while Michelle spent 2 years at Kipapa Elemnetary School, Michelle, Natalie and family did not receive DTT services, TAs, mental health services, respite care, or parent counseling.

C. Special Education Consultation (in-service), Ms. Hawkinson, 4/23/07 –
   ▪ In regards to Autism, Ms. Hawkinson states that these children tend to reach a threshold of growth. In her opinion, no two children with autism are alike and it's too difficult to compare or have an expectation for their development.
   ▪ Overall, there has yet to be any research that demonstrates a methodology that consistently can be expected to treat the condition with a high degree of predictability.

- Ms. Hawkinson stated that benefits of appropriate instruction are not time sensitive to the degree that appropriate instruction is no longer a benefit or doesn't impact the child in a positive way; there is no evidence that supports that future development is limited due to not receiving a particular method of treatment in a set timeframe. While plasticity declines in adulthood, it still continues.
- In regards to Individualized Educational Plans (IEPs), Ms. Hawkinson said that there are no universal standards but instead reasonably expected models and Michelle was unlikely harmed by inadequate wording.

D. Rebuttal Report (to Ms. Hawkinson's 4/23/07 Report), Beverly James, 5/19/04 –
- Ms. James stated that Michelle H. was denied autistic specific services from 1994-1998 and was ultimately harmed by the actions or inactions taken by the DOE.
- She said that Mr. and Mrs. H. have symptoms consistent with Major Depressive Disorder and PTSD which conflicts with Dr. Briskin's Report in which he diagnoses them with Adjustment Disorder with Mixed Anxiety and Depressed Mood.
- Ms. James disagrees with three major topics addressed in Ms. Hawkinson's Report including 1) Autism Specific Methodologies, 2) Early Intervention, and 3) Procedural Errors in IEPs.
- Ms. James stated that there is not a question of effectiveness of the services provided but instead there is a question of why there were no services provided at all.
- Ms. James said that early intervention is mandated by law and is supported by the basic principals of human brain development and learning.
- In regards to procedural errors, Ms. James stated that Ms. Hawkinson failed to recognize an IEP as a critical educational, clinical and legal process.

E. Legal Consultation in Special Education Report, Barbara Bateman, 1/29/01 –
- There was a five year delay in services for Michelle.
- The most damaging inadequacies in the DOE's offerings include: 1) failures to thoroughly inform parents of their rights and their daughter's entitlements under IDEA, 2) failure to provide adequate and thorough diagnostic evaluations, 3) failure to provide early, intensive programs utilizing autistic techniques, 4) failure to provide qualified teachers, 5) failure to provide appropriate behavior plans, and 6) failure to provide necessary parent training.
- Other inadequacies addressed that are specific to Michelle include inadequate reason for placement, lack of special services, lack of behavioral plan, lack of specificities on regular education participation, and lack of a program specific to autism. All of the above are considered IDEA violations.

F. Rehabilitationist Report, Carol Forsloff, 7/11/03 –
- Ms. Forsloff addressed that appropriate jobs for people who are autistic would be something that does not require high demands on short term memory or any complex sequencing by verbal commands.

- Examples of such jobs include assembly work, running photo copies, watering and caring for plants, cleaning and cooking, landscaping, mowing lawns, sorting type jobs (recycling), janitorial jobs and data entry.
- It is important to take into account that Dr. LeGoff said that Michelle has no capacity for interpersonal relationships.

G. Special Education Consultation, Joan Hawkinson –
  - Ms. Hawkinson concluded that while a structured behavioral program is regarded as effective, there is no cure for autism. Also, Michelle's development was not stopped just because a particular strategy was not employed during her pre-school years.

H. Neurodevelopmental Re-Evaluation, Dr. LeGoff, 6/6/08 –
  - Michelle is now 17 years old.
  - Michelle's diagnoses are as follows: Axis I: Autistic Disorder, Axis II: Mental Retardation, Axis IV: Communication, social and adaptive, Axis V: GAF = 20.
  - Michelle has very limited communication and still needs to be prompted when asking for things.
  - Michelle has some basic proficiency with a keyboard and can use a mouse, but does not write anything.
  - Michelle gets upset and agitated very easily, especially when there are changes in her schedule or routine.
  - Michelle's newest Vineland results were in the mildly to moderately impaired range which is consistent with her results from four years ago (i.e. Michelle has not progressed in the past 4 years). Michelle's adaptive function for receptive and expressive communication have regressed by at least one year for each sub domain. Dr. LeGoff opinions that Michelle's regression is indicative of continuing inadequate programming.
  - Michelle's adaptive functioning is best at home. Dr. LeGoff stated that they should continue program services and focus on functional communication, social interaction and adaptive functioning. He also said that Michelle should begin transition planning and consider potential residential and supported living and vocational settings as soon as possible.
  - In conclusion, Dr. LeGoff stated that Michelle functions within the moderate to severe level of autistic pathology with clear and pervasive indications of communication and social impairment, as well as repetitive stereotyped behaviors and restricted range of interests and activities.

I. Telephone Conference with Dr. Sheinkoph, 8/21/08 –
  - Michelle is fairly limited in comparison to her similar aged peers.
  - Michelle has mild to moderate Mental Retardation and a significant language impairment.
  - Michelle can understand some directions and has limited basic adaptive abilities such as use of small amounts of money and basic writing.
  - Michelle's IQ score is in the 40s, with an even lower Non-verbal IQ score.
  - Dr. Sheinkoph opinions that Michelle H. is not competitively employable and sheltered work or supported employment are a possibility for her future, and she will not have great independence.

**2.    School Visit:**

On 6/4/08, I attended Roosevelt High School in Honolulu, HW. Activities consisted of meetings with Michelle's transition teacher (Steven Pepe), her autism resource specialist (Alida Gandy), teacher (Cathy), and one-on-one support (Clare). I also observed Michelle in her classroom and adaptive PE class and interviewed her mother, Rie H. with the assistance of an interpreter.

In observing Michelle in her classroom and PE activities, the following was noted:

- Michelle is able to communicate to a limited degree. She makes eye contact when answering a question, but requires more prompting than Natalie.
- She needs a lot of prompting to stay on task, looking at the aide as if waiting for the prompt.
- She is very cooperative working with her aide and teachers.
- She is very animated and childlike in her verbalizations and excites easily.
- She can write slowly and erase.
- She is very limited in her ability to read, placing material 6" from her face.
- She can read a clock and state the correct time.
- She appears to fatigue easily and her affect will change when tiring.
- In her PE class, Michelle was largely unable to follow the teacher's cues re: lower and upper extremity physical movements. She totally relied upon aide for cues and prompting.
- She was unable to replicate the sequence of movements teacher demonstrated whereas Natalie could.
- She had less balance than Natalie when laying back on the exercise ball.

In my interview with Rie H., Michelle's mother, she reported the following information:

- She is a HS graduate in Tokyo, she has no college. She has worked in the past as a teller and in clerical jobs. She does not work @ present.
- Michelle's Father is a HS grad and thinks he finished some kind of degree (she thinks Business) at the University of Phoenix.
- He has worked that past 4-5 years in private security, working for individuals. He drives for them and accompanies them on travel. Previously, he worked in tourism related sales.
- She feels Michelle has made progress in some areas, not in others, such as: she won't walk in the crosswalk when crossing a street; she lacks judgment and awareness of dangers in her environment.
- She would like her to speak more.
- Michelle still has tantrums at home but she has improved in both frequency and intensity of tantrums.
- She is making progress in her orientation to time and place.
- She has not noticed improvement in her language skills.
- She is unsure of any progress in attention & focus.
- She states Michelle was on SSI, but their income exceeded limits. She thinks she can get back on at age 18.
- She is unaware of DVR services. She has contacted Dept of Health/DD services, but "it hasn't done anything".

- She stated work goals for both daughters are the same, nursery work, light production/assembly work, etc.
- She feels only options were for daughters to live with her, live independently, or be in an institution. She was unaware of any group living options.
- She expressed surprised when told her daughters could be in school until age 20. She thought it was age 22.
- She would like Michelle to be able to do some kind of work when done with school.
- She questioned what type of employment someone with autism could do?

In my interviews with Michelle's teachers and other staff, the following information was obtained:

- Michelle attends the Occupational Skills Center, 4 days/week.
- So far, she has participated in light assembly and plant nursery activities. She has also done some clerical work, such as collating, stapling, and filing. She can alphabetize, sort numerically 1-50.
- Next step in OSC might be auto detailing. In cooking she could not use knives. Also, could not do power sewing or carpentry for safety reasons.
- School transition activities are focusing on life skills ADLs.
- She works neatly, can stay on task now 6-8', before was less than 5'.
- If she has the same task and repeats it over and over for 2 weeks, she can then perform it independently.
- She is very compliant and gets along well. She doesn't initiate social interaction.
- They are trying to break her away from dependence on 1:1 aide, trying to get her to respond to visual cues, i.e. facial expression, gestures and working off her schedule vs. needing verbal prompts from her aide.
- She has a problem with sleepiness. She goes to bed late. TV is on all the time @ home. Not sure if she is on medication. Her menstrual cycle seems to make a big difference in her attention levels.
- She watches a lot of movies at home and seems to run tapes in her head.
- She has occasional tantrums, but they are very mild now. Used to be much more extreme. She verbalizes better now and has better coping skills.
- She takes criticism well, better than Natalie.
- Her handwriting has improved a lot. With repetition, she really improves.
- It is expected that she will stay at this school thru graduating with her class at age 18, but she could stay until age 20.
- Per discussion with her teachers and staff, it was learned that primary focus areas for Michelle include communication and interpersonal skills, life and independence skills; including cooking, cleaning, etc., preparing for when they might live in a group living situation.
- Her stamina has improved a lot. She can now be productive for up to 2 hours, it used to be 5'. She needs some variety or she will get agitated.
- She can read works but lacks comprehension.
- She seems to know how to use a computer for basic things.
- She has matured and is growing. She is more adaptable.
- In addition, she is being exposed to occupational skills, having already participated in some light assembly and nursery-type work.

- She works with 5-10 other students. Almost all require 1:1 supervision.
- Michelle might be able to work in an enclave eventually, but needs to be very familiar with her task. Could see her doing office work or maybe in a cafeteria.
- This occupational focus will increase in her senior year, transitioning to Department of Vocational Rehabilitation or DD services, depending upon their decision as to her ability to benefit from services.
- Winters @ Work and Abilities Unlimited are sheltered workshop options.
- Other options include Goodwill and Easter Seals programs. There is also a supported employment program through the Oahu Special education Center (SECO). All of these are available as transition options, which is part of her IEP.
- Her teachers do not believe Natalie will ever be competitively employed.

## Background Summary

Date of Birth: 2/15/██. She is 17 years old.

Living Situation: Michelle lives at home with her parents and other sibling, Natalie.

## Occupational Analysis

To determine possible future employment options for Michelle, a preliminary Occupational Analysis was conducted using Software for Education, Employment, & Rehabilitation (SEER 2.0, 2005). SEER utilizes the United States Department of Labor's O*NET database and Standard Occupational Classification (SOC). O*NET identifies 120 SOCs that, based on their occupational information, are broken out into more detailed O*NET occupations.

Typically, the occupations of a child's parents can be used to estimate a child's pre-morbid vocational capacity. Given the issues on this case and Natalie's various disabilities, this would have been inappropriate. Instead, we completed an occupational analysis which utilized Natalie's test scores in different ability areas. Natalie has very low abilities in reasoning, communication, and language. We were able to compile a limited list of possible compatible jobs for a person who has very low abilities and require little or no preparation. These results included these occupations:

> Sewing Machine Operators, Garment, SOC 51-6051
> Graders and Sorters, Agricultural Products, SOC 45-2041
> Dishwashers, SOC 35-9021
> Food Preparation Workers, SOC 35-2021
> Helper – Production Workers, SOC 51-9198

## Disability & Employment Research

A literature review (Exhibit IV) was conducted to obtain baseline information with regard to typical outcomes for persons more significant and work limiting disabilities, in particular persons with autism and mental retardation. Both Federal and State data resources were utilized, including the largest, most reliable federal surveys of disability prevalence and status, employment, and earnings.

Michelle H. – Vocational Rehabilitation Report of Robert Hall, Ph.D., CRC, CDMS                    9

Michelle has multiple impairments as a result of her autism and mental retardation. In our attached literature review we discuss common difficulties people with mental retardation and autism face in the world of work some of which include difficulty communicating, limited social skills, unusual behaviors, and reliance on routinized work activities. Autistic persons, especially those with fewer functional limitations and higher IQ do have more employment potential, but there is little data available, especially longitudinal employment data. Those autistic persons with other work limiting impairments and lower IQ have lower employment rates and greater work retention problems.

Competitive employment is typically not possible. However, with respect to autism alone, some research[1] shows that people with these impairments can benefit from supported employment programs and sheltered work opportunities. Integrated community employment strategies offer some advantages over sheltered employment, but most persons with significant mental retardation who maintain employment do so in sheltered employment. Intensive job coaching and supervision as part of a supported employment program can improve outcomes somewhat, they are difficult to maintain over time.

Examples of typical sheltered employment work opportunities for people with autism range from data input or assembly work to gardening. While few autistic children grow to be fully self-supporting, work opportunity of a limited type and nature is typically feasible, but tends to be sporadic, part-time, and provides little actual income.

In summary, although some progress has been made in understanding which services lead to improved employment and earnings outcomes, most persons with significant and more severe disabilities do not work competitively and earn little income. In all cases, the probability of persons with this level of disability working competitively and maintaining an employment role over their life span is well below 50%. Work tends to be sporadic, part-time, and produces little income. Most persons receive federal disability benefits (SSI) and maintain those over their lifespan.

**F.    Discussion and Opinions**

Note: At this time, my opinions are based upon the information reviewed to date and the results of our vocational evaluation, thus these opinions are subject to change and/or modification should further information become available.

## Employability

Persons with Michelle's type and level of impairment (Autism/MR) typically do not work competitively. The range of employment outcomes for persons with her impairments are represented by sheltered work or supported employment (long-term) with individualized supervision or in a group enclave which is also heavily supervised.

---

[1] Inge, K. (2007). Supporting individuals with autism in integrated community jobs: identifying support needs to facilitate success. CRP-RCEP, Virginia Commonwealth University. Ross, D., Garcia-Villamisar, D. & Wehman, P. (2000). Clinical differential analysis of persons with autism in a work setting: a follow-up study. *Journal of Vocational Rehabilitation 14*, 183-185

Michelle will likely stay on SSI and any earnings she has from employment would be negligible. The value of employment activity for her will largely be with respect to quality of life and socialization, not economic. Given the severity of her disabilities and functional limitations, I believe to a reasonable degree of vocational probability, this would have likely been the case, independent of what educational services might have been provided her in the past.

## Recommended Vocational Rehabilitation Services

The following provides my recommendations for vocational rehabilitation services for Michelle from this date forward. As a basis for these recommendations, the following was considered:

Michelle has been diagnosed with autism and mental retardation. She is 17 years old, is in the moderate to severe range of impairment for her level of autism and mild to moderate range of mental retardation. She has expressive language deficits which impact her abilities for social and communicative function.    Goals for her include increased opportunities to allow for social interaction and increase their independent living skills. Research was conducted to evaluate the available services for her to meet these goals. The service agencies which are available in her local area are listed below:

1) <u>Hawaii Vocational Rehabilitation and Services for the Blind</u> – the vocational and rehabilitation services for the blind is a state-federal program that provides services to help people with physical or mental impairments to attain successful employment outcomes.    This service provides an assessment of the individual resources, abilities and interest, case management and development of an Independent Plan for Employment. There are six local offices in Hawaii. Ability to benefit from these services would be determined during eligibility screening.

2) <u>Puna Kamali'i Flowers, Inc.</u> – this agency is one of the leading employers of individuals with disabilities in Hawaii.    They provide supported employment placement with a job coach who will be trained to assist the individual on a job and continue as long as they need assistance. Their webpage states, "you do not need to have many skills already, nor do you need to know how to read, write or even speak."

3) <u>The Hawaii Department of Health – Developmental Disabilities Division</u> – this agency provides case management and information services to people with development disabilities and/or mental retardation. They also provide information on adult day health, transportation and supported employment services.

4) <u>Goodwill Industries of Hawaii</u> – a private non-profit corporation that provides job training and employment service programs for people with various barriers to employment. Good will industries will individualize the training to each individual's goals.    Goodwill can provide training in a specific career field, provide an opportunity to intern or practice work skills, assist in increasing physical stamina for work and help to improve job seeking skills.

5) <u>Kapiolani Counseling Center –</u> to assist Michelle, Natalie and their family in dealing with their continued impairments, this agency will provide therapy services for individuals and their families experiencing emotional/behavioral problems.

6) <u>The Hawaii Disability Rights Center -</u> is a protection and advocacy system for the residents of Hawaii who are living with disabilities.  This service engages in outreach to under-served populations, provision of information by providing referrals to other resources, education and training activities for people with disabilities and others involved in their life, and individual casework by way of technical assistance, self advocacy, and short term assistance.

For purposes primarily of quality of life and community involvement, not competitive employment, some vocational rehabilitation services maybe beneficial.  The following long-term services would likely be required to facilitate Ms. H.'s possible pursuit of employment:

<u>Vocational Rehabilitation Services:</u>
1. Supported Employment Services (1:1 or group enclave with supervision)
2. Vocational Skills Training
3. Case Management

Job placement and employment retention support services would be of particular benefit to Michelle, once she reaches an appropriate age, expected to be after age 20. She will be able to receive these services without cost from one or more of the above agencies. Case management and coordination of services is also needed and should be available from the Hawaii Department of Health.

Given her level of disability, I believe that to a reasonable degree of vocational probability, these services would have been required for her, independent of what educational services she may have been able to obtain in the past.

I will defer to other experts on any other services Ms. H. may require.

**<u>Rebuttal to Carol Forsloff's Report, 7/11/03 –</u>**
*"It is impossible to predict what either girl may have achieved had appropriate, early educational and therapeutic intervention been provided and the parents given important guidance and counseling. On the other hand, literature indicates that many autistics were able to work productively in a variety of occupations and that early intervention is very important in providing the best possible opportunity for vocational success."*

<u>While Ms. Forsloff recognizes that it is impossible to predict what achievement levels Michelle might have achieved with additional services, she overstates the evidence of employment success for persons with Michelle's type and severity of impairment. Because Michelle also has significant mental retardation, the literature that focuses just on autism would be inappropriate to rely upon. As described in our attached literature review, disability statistics indicate very low labor force participation rates for people with Natalie's level of combined impairments of severe autism and mental retardation.</u>

*"These girls (Natalie and Michelle H.) did not receive early, consistent intervention by trained specialists and therefore their vocational futures have been severely compromised."*

*"The fact that neither Natalie nor Michelle were provided with this intervention (early) has likely made a substantial difference in their present and future achievement."*

*"It is also entirely possible that because they did not receive important early intervention that they will never be able to work and therefore have lost a lifetime of potential earnings and require dependent care for the foreseeable future."*

Ms. Forsloff stated that Michelle would have achieved more but for the alleged lack of services. These opinions are beyond the scope of Ms. Forsloff's training and expertise and she fails to take into account the opinions of other qualified experts who disagree that the alleged lack of services have had this permanent, negative impact on Natalie's and Michelle's development.

Overall, Ms. Forsloff's estimate of Michelle's potential occupational attainment is unsupported by facts and inconsistent with employment and earnings data for persons with her type and severity of impairment.

I defer to other experts Ms. Forsloff's recommended services for communication and social services training, medical management, behavioral psychology, and counseling and respite care for Michelle's parents.

As discussed above, I agree with Ms. Forsloff's recommendations for case management and pre-vocational training and situation assessments. I do feel these services are available at no cost to her in the local community and that she would have likely required these same services with or without any special need created by the alleged lack of early intervention or services.

This completes my report. Please contact me at 619-463-9334 should you have any questions.

Respectfully,

Robert Hall, Ph.D., CRC, CDMS